In re INTEGRATED RESOURCES,
INC., also d/b/a IRI Services,
Inc., Debtor.

The OFFICIAL COMMITTEE OF SUB-
ORDINATED BONDHOLDERS, Ap-
pellant,

v.

INTEGRATED RESOURCES, INC.
and Bankers Trust New York
Corporation, Appellees.

No. 92 Civ. 430 (MBM).

United States District Court,
S.D. New York.

Oct. 28, 1992.

Steven E. Greenbaum, Carole L. Fern, John P. Biedermann, Berlack, Israels & Liberman, New York City, for appellant.

Jeanne M. Luboja, Myron Trepper, Willkie Farr & Gallagher, New York City, for appellee Integrated Resources, Inc.

Thomas J. Moloney, Shari Siegel, Cleary, Gottlieb, Steen & Hamilton, New York City, for appellee Bankers Trust New York Corp.

## OPINION AND ORDER

MUKASEY, District Judge.

Appellant, a committee of subordinated bondholders, appeals from an order and memorandum decision of the United States Bankruptcy Court for the Southern District of New York (Blackshear, J.), approving a break-up fee arrangement among appellees, the debtor and a prospective purchaser. For the reasons set forth below, the challenged order is affirmed.

### I.

Appellees are Integrated Resources, Inc. ("Integrated") and Bankers Trust New York Corporation ("BT"). On February 13, 1990, Integrated filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). See In re Integrated Resources, 135 B.R. 746, 748 (Bankr.S.D.N.Y.1992). The bankruptcy court appointed three creditors' committees to serve in this case: (1) Committee of Holders of Bank Debt (the "Bank Committee"); (2) Committee of Senior Public Debt and Commercial Paper Holders (the "Senior Debt Committee"; together with the Bank Committee, the "Senior Committees"); and (3) the Official Committee of Subordinated Bondholders (the "Sub–Debt Committee").

On November 8, 1991, Integrated, the Senior Committees, and BT entered into a letter agreement (the "BT Proposal"), whereby BT offered to fund a plan to reorganize Integrated with $565 million in cash, conditioned upon the bankruptcy court's approval by November 25, 1991. The BT Proposal provided for an expense reimbursement and break-up fee arrangement (the "Break-up Fee") in favor of BT. A break-up fee, or more appropriately a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction.

Integrated sought approval of the BT Proposal and Break-up Fee on November 12, 1991. At a conference the next day, the bankruptcy court rejected the claim by the Sub–Debt Committee, not a party to the BT Proposal, that it needed discovery on the broad issue of which, if any, third-party offer was the highest or best. The court refused to reschedule the hearing and limited discovery to the narrow question to be heard on November 25, 1991: whether it should approve the BT Proposal.

Between November 13, 1991 and November 24, 1991, the Sub–Debt Committee conducted document discovery and took the depositions of representatives of Integrated, BT, and the two Senior Committees. On November 25, 1991, Judge Blackshear, after a lengthy hearing, approved the Break-up Fee, as modified. He rejected the Sub–Debt Committee's argument that the process which led to the BT Proposal was tainted by the self-dealing of Integrated's management. In re Integrated Resources, 135 B.R. at 752. On December 5, 1991, the Sub–Debt Committee filed a Notice of Appeal from the bankruptcy court's Order and subsequent Memorandum Decision on Motion for Approval of Break–Up Fee and Expense Reimbursement Agreement. Id.

### II.

Integrated is primarily a holding company that owns numerous operating entities whose prepetition business included operating life insurance companies; organizing, managing, and selling direct participation investment programs; providing investment counseling and money management services for private accounts and mutual funds sponsored by Integrated; equipment leasing; operating media properties; and managing certain contractual rights and obligations. Since filing its petition, Integrated has continued to manage, as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code, its partnership-related businesses, equipment leasing busi-

ness, contract rights operations, certain operating subsidiaries, and other less significant assets. Integrated has streamlined its operations, reduced costs, and sold or otherwise disposed of various assets and business lines. *In re Integrated Resources, Inc.*, 135 B.R. at 748.

Initially, Integrated tried to develop an internally funded plan of reorganization. However, Integrated and the Senior Committees disagreed about Integrated's ability to confirm and consummate such a plan. As a result, since June 1991, Integrated has pursued third-party funding in an effort to resolve key issues dividing itself and the Senior Committees, and has contacted numerous parties in an effort to locate a buyer. Integrated entered into confidentiality agreements with those entities that showed serious interest, in order to permit those entities to conduct the detailed investigations necessary to informed decisions about acquisition—often referred to as "due diligence"—while at the same time safeguarding Integrated's confidential information.

In January 1991, BT prompted Integrated to establish a data room and began to examine Integrated in earnest. On or about January 23, 1991, Integrated entered into a confidentiality agreement with BT. Importantly, it was the Senior Committees, sophisticated investors with approximately $1.5 billion in claims, *not* Integrated management, who led the negotiations with BT. BT and the other prospective bidders have used the data room since early 1991. (Weinroth Dep. at 66, 208)

Because BT expressed serious interest in funding a plan, Integrated filed a motion for authorization to enter into an agreement to reimburse BT's expenses. However, the Creditors' Committees strenuously objected and Integrated withdrew the motion. Nonetheless, BT continued its investigation without such reimbursement. *In re Integrated Resources*, 135 B.R. at 748–49.

Integrated successfully used BT's bid both as a bid comparison to spur existing bidders and as a magnet to attract additional bidders. By summer 1991, Integrated

had contacted approximately 30 potential bidders. (11/25/91 Hr'g Tr. at 50) The Hallwood Group Incorporated ("Hallwood"), which previously had considered purchasing certain limited assets from Integrated, began investigating a bid for Integrated's entire business in April 1991, but when BT temporarily withdrew in August 1991, "the Hallwood offer was substantially lower." (11/25/91 Hr'g Tr. at 66) Integrated Chairman Stephen Weinroth showed documents to Hallwood that compared the values in the BT Proposal and in Hallwood's bid. (Weinroth Dep. at 193) Following the BT Proposal, another group, Penguin Realty Associates Limited Partnership ("Penguin"), which had expressed interest in funding a plan and had investigated Integrated's assets, raised its tentative offer. *In re Integrated Resources*, 135 B.R. at 752. At the November 25, 1992, Chairman Weinroth reaffirmed "our determination that we have to keep them [BT] in the hunt and it [the Break-up Fee] does establish what we believe to be a decent price as a floor for any other plan funder." (11/25/92 Hr'g Tr. at 67)

However, none of the prospective buyers has been willing to sign a binding agreement, because a plan to reorganize Integrated would entail a commitment of hundreds of millions of dollars and considerable risk. The bid preparation required extensive investigation. Integrated's assets were, and still are, complicated and not easily valued. These assets include so-called deferred origination contract rights, which represent future rights to payment in connection with real estate limited partnerships Integrated sponsored throughout the country. (11/25/92 Hr'g Tr. at 154–57)

Not surprisingly, BT and the other bidders incurred substantial out-of-pocket expenses and opportunity costs in trying to understand and evaluate Integrated's finances. To sustain the bidders' interest and ensure the maximum value of their estate, Integrated and the Senior Committees considered proposals for break-up fees and expense reimbursement from *all* the bidders, not only from BT. An earlier proposal by Hallwood had provided for a $4

million break-up fee, and the current proposal by Penguin provides for a break-up fee of $8.5 million and expense reimbursement of $2 million. *In re Integrated Resources*, 135 B.R. at 753 n. 6.

The Break-up Fee which appellants challenge is a component of the BT Proposal and a condition precedent to funding a plan of reorganization. The Break-up Fee would be payable to BT if (1) Integrated sells to anyone other than BT any material assets proposed to be acquired by BT or enters into a transaction that otherwise is materially inconsistent with the BT Proposal (an "Alternative Transaction"); (2) a plan of reorganization based on the BT proposal or a subsequent definitive agreement with BT (a "Definitive Agreement") is abandoned; or (3) the creditors of Integrated receive a material divided or distribution respecting their claims. By contrast, the Break-up Fee would not be payable if BT abandons its proposal because of a material adverse change, is unable to obtain any necessary regulatory approvals, or materially breaches the BT Proposal or a Definitive Agreement.

The Break-up Fee originally provided for the following amounts to be paid to BT: (1) $500,000 if the BT Proposal is abandoned because Integrated and the Senior Committees find unacceptable the list of Integrated subsidiaries that BT requires to file bankruptcy petitions (a condition of the plan funding proposal); (2) $2 million if Integrated and the Senior Committees elect to terminate ("Termination Election") negotiations with BT by February 15, 1992, and do not agree to pursue an Alternative Transaction with another party; (3) $4 million if, by February 15, 1992, Integrated has not made a Termination Election, and has neither agreed to an Alternative Transaction nor executed a Definitive Agreement with BT; and (4) $9 million if Integrated fails to consummate the transaction after

the Definitive Agreement has been executed. *In re Integrated Resources*, 135 B.R. at 749. Following the bankruptcy judge's advice at the November 25, 1991 hearing, Integrated and BT agreed to the following reductions in the Break-up Fee: the $2 million payable upon Termination Election by a date certain was decreased to $1.25 million; the $4 million payable if, by February 15, 1992, Integrated has not made a Termination Election, and has neither agreed to an Alternative Transaction nor executed a Definitive Agreement with BT, was decreased to $2.5 million; and the $9 million payable upon breach after a Definitive Agreement was lowered to $6 million. *Id.* at 753.

The BT Proposal also included a "window shop" clause. A window shop clause is a promise not to solicit a later, better offer, but which permits a board to look at such an offer, provide information to the offeror, and, under appropriate circumstances, accept the offer. Dennis J. Block, Nancy E. Barton and Stephen A. Radin, The Business Judgment Rule 226 (3d ed. 1991). The BT Proposal provided that upon execution of a Definitive Agreement, Integrated and the Senior Committees agreed not to solicit or initiate the submission of offers to pursue an Alternative Transaction. However, Integrated and the Senior Committees would retain the right to discuss or negotiate a plan with any parties who initiate, or with whom they are currently having, negotiations. The parties could then proceed with an Alternative Transaction after a Definitive Agreement, without being obligated to pay a break-up fee, only if the consideration paid to Integrated pursuant to any Alternative Transaction exceeds the cash portion of the BT funding proposal by no less than $20 million. Integrated and BT agreed at the November 25, 1991 hearing to lower this amount to $15 million.[1]

---

1. Like "break-up fee," the term "window shop" is misleading. To "window shop" is "to look at the displays in store windows without going inside the stores to make purchases." Webster's Third New International Dictionary, Unabridged 2620 (1986). The BT Proposal does not confine Integrated to "window shopping." By

contrast, a "window shopper" bound by the type of provisions in the BT Proposal could enter and make purchases at those stores where he had previously shopped and at those stores which invited him inside, but only if he spent a minimum amount; however, he could not enter any store for the first time uninvited.

Moreover, under the BT Proposal, Integrated would pay BT $250,000 as partial reimbursement for certain expenses in connection with the BT Proposal, and would pay BT up to an additional $1.25 million for the remainder of such expenses if the proposal is abandoned for any reason. *Id.* at 749. The BT Proposal did not include an agreement with existing Integrated management to provide any bonus or future employment. Integrated's board of directors reviewed and approved the BT Proposal; five of the eight members of the board were "outside" directors, *i.e.*, not also members of management. (11/25/91 Hr'g Tr. at 70) The bankruptcy court upheld the directors' approval.

### III.

■ The bankruptcy court's fact determinations are binding unless clearly erroneous, and its conclusions of law are reviewable *de novo*. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988–89 (2d Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991); *In re Financial News Network, Inc.*, 126 B.R. 152, 154 (Bankr. S.D.N.Y.1991). "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed.R.Bankr.P. 8013. Rule 8013 gives to the findings of a bankruptcy judge the same weight given to the findings of a district judge under Fed.R.Civ.P. 52. Moreover, "[t]o further the purposes of Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his [or her] orders to meet differing circumstances." *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir.1983).

In this case, the bankruptcy court ruled that the business judgment rule applied to Integrated's approval of the BT Proposal. The court recognized that "the business judgment of the Debtor is the standard applied under the law in this district." *In re Integrated Resources*, 135 B.R. at 752–53 (noting that even "[t]he Sub–Debt Committee agreed that the appropriate test applied to a request for authorization to exe-cute a break-up fee agreement is the business judgment of the debtor"). The question which remains for this court to resolve is how the business judgment rule applies to bidding incentives, such as break-up fee arrangements, in bankruptcy.

■ The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984). These Delaware business judgment rule principles have "vitality by analogy" in Chapter 11, especially where, as here, the debtor Integrated is a Delaware Corporation. *See In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y.1989). The business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." Dennis J. Block, Nancy E. Barton and Stephen A. Radin, The Business Judgment Rule 12 (3d ed. 1991).

■ Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. *Van Gorkom*, 488 A.2d at 872–73; *FSLIC v. Musacchio*, 695 F.Supp. 1053, 1064 (N.D.Cal.1988) ("a ruling on the applicability of the business judgment rule is peculiarly a question of fact"); *Burton v. Exxon Corp.*, 583 F.Supp. 405, 415 (S.D.N.Y. 1984). Courts "will uphold the board's decisions as long as they are attributable 'to any rational business purpose.'" *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y.1988) (citations omitted). Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity. *Aronson v. Lewis*, 473 A.2d at 812.

Break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule. *See, e.g., Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir.1988) ($29 million termination fee protected by business judgment rule where fee not shown to be unreasonable in relation to $2.5 billion transaction); *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. at 440 (break-up fees not illegal when they enhance rather than hamper the bidding); *Samjens Partners I v. Burlington Indus.*, 663 F.Supp. 614 (S.D.N.Y. 1987) (break-up fee protected by business judgment rule).

However, few courts have addressed the validity of break-up fees in bankruptcy. *See, e.g., In re Integrated Resources*, 135 B.R. 746 (Bankr.S.D.N.Y.1992); *In re T.V.S.I. Holdings, Inc. et al.*, Nos. 90 B 13581–13586, 90 B 13856–13864 (CB), slip op. (Bankr.S.D.N.Y.1991) (approving $3.5 million break-up fee in transaction involving $30 million in cash and $108 million in preferred stock); *In re Marrose Corp.*, Nos. 89 B 12171–12180 (CB), slip op. (Bankr.S.D.N.Y.1991) (denying fee to unsuccessful bidder who abandoned bid due to inadequate financing); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y.1990) (approving $500,000 break-up fee in a $45 million sale, without discussing merits); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24 (Bankr.S.D.N.Y.1989) (approving $500,000 break-up fee after $76 million sale).

These decisions suggest three questions for courts to consider in assessing break-up fees: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price? The bankruptcy court answered "no" to each of these questions. For the reasons set forth below, those answers are affirmed.

### A.

The first question is whether the relationship between BT and Integrated's management was tainted by self-dealing and manipulation. A court will uphold a decision by the board of directors if the decision was safeguarded by the scrutiny of disinterested directors or by other such means. *See In re 995 Fifth Ave. Assoc.*, 96 B.R. at 28. The Break-up Fee in this case was safeguarded by both the creditors and a disinterested board.

Most important, the Senior Committees closely scrutinized the decisions of Integrated's board of directors. The Senior Committees acted as principal negotiators on the BT Proposal. Integrated's decision to pursue third-party funding was based on resolving disputes with the Senior Committees; the BT Proposal reflects a consensus resolution of those disputes. A break-up fee has been upheld where, as here, the creditors' committee closely scrutinized the fee, the fee was not unreasonable in relation to the size of the sale, and the work and expense involved in negotiating the transaction were significant. *Id.*

In his decision below, Judge Blackshear explained that he had hesitated to approve the fee solely because of its initial amount, not because of the Sub–Debt Committee's allegations of a "sweetheart deal" between Integrated's management and BT. *In re Integrated Resources*, 135 B.R. at 752. The judge specifically found that the business judgment rule applied to Integrated's approval of the Break-up Fee and noted that Integrated's business judgment, coupled with the support of the Senior Committees (who, he noted, had a historically acrimonious relationship with Integrated), and the willingness of the parties to decrease the amount of the original break-up fee, weighed decisively in favor of granting the motion. *Id.* at 753.

The business judgment rule is available when a majority of a corporation's independent and disinterested outside directors have approved a transaction. *See, e.g., Tomczak v. Morton Thiokol, Inc.*, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) 95,327, 1990 WL 42607 (Del.Ch. 1990); *Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989). Integrated's board of directors re-

viewed and approved the BT Proposal. Five of the eight board members were disinterested outside directors.

Generally, a court will assess itself the merits or fairness of business decisions only "when a transaction is one involving a predominantly interested board with financial interests in the transaction adverse to the corporation." *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 111 (Del.Ch.1986). Moreover, the appropriate test is the "entire fairness" of a transaction, rather than the business judgment rule, only "in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries." *Mills Acquisition Co. v. Macmillan Inc.*, 559 A.2d 1261, 1279 (Del. 1988). A bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations. *See In re 995 Fifth Ave. Assoc.*, 96 B.R. 24 (Bankr.S.D.N.Y. 1989).

The court below found that the discussions between Integrated and BT were not tainted by self-dealing so as to remove the protection of the business judgment rule. *In re Integrated Resources*, 135 B.R. at 752. The Sub–Debt Committee failed to meet its burden of establishing any material personal interest or self-dealing by a majority of Integrated's directors. The record does not support appellant's suggestion that management controlled and manipulated the Break-up Fee negotiations. Although BT and Integrated discussed the future management of Integrated, they never reached an agreement on that subject. General discussions with management which do not ripen into an agreement do not preclude application of the business judgment rule. For example, the business judgment rule applied when the chairman of an acquired company testified that, prior to an acquisition, he was told by the chairman of the acquiror "that the possibility of a directorship [for the chairman of the acquired company after the transaction] 'was in the cards.'" *Citron v. Fairchild Camera*, 569 A.2d at 65. BT did not forfeit the Break-up Fee merely because it discussed, in hypothetical terms, that the future management of the entity to survive Integrated might include current officers and directors.

Appellant further asserts that the Break-up Fee is inappropriate because the directors and management of Integrated breached certain fiduciary duties. The board did not breach its duty of care. The standard under which a director's duty of care is to be scrutinized is "gross negligence." *Aronson v. Lewis*, 473 A.2d at 812. There is no evidence of gross negligence here.

When it becomes clear that a company is for sale and a takeover becomes inevitable, the board of directors is under a further duty, when conducting an auction, to deal fairly with the bidders. *Revlon*, 506 A.2d at 185; *Samjens Partners*, 663 F.Supp. at 624. The directors are obligated to secure the maximum value for the shareholders once the company is "in play" without regard to their own desires regarding their tenure or financial interests. *Paramount Communications, Inc. v. Time, Inc.*, 571 A.2d 1140, 1150 (Del.1989); *Revlon*, 506 A.2d at 185; *Samjens Partners*, 663 F.Supp. at 623–24. Thus, when a board agrees to such "buyer protection" devices as break-up fees, it may be required to show that these devices do not contravene its duty to maximize value for the shareholders.

In the non-bankruptcy takeover cases, management's fiduciary duties run primarily to the corporation's shareholders. *See Revlon Inc. v. MacAndrews & Forbes Holdings Inc.*, 506 A.2d 173 (Del.Sup.1985). In contrast, the management of a bankrupt company must "further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983). The bankruptcy court must resolve the tension which results from the sometimes conflicting objectives of these constituencies. *See In re Crowthers McCall Pattern Inc.*, 114 B.R. 877, 881 (Bankr.S.D.N.Y.1990) ("Nowhere does the Code address this tension. The courts balance these concerns on a

case by case basis."). Shareholders tend to seek the long-term rehabilitation of the enterprise and to retain even those assets which make only a marginal contribution to profitability. Bondholders, unlike shareholders, will often try to force the sale of profitable assets to generate cash quickly to pay their claims. The general goal of debtors, and the creditors' committees with whom they principally negotiate, is the formulation of a "largely" consensual plan. *Id.* at 881.

For example, the bankruptcy court in *Crowthers* upheld a break-up fee and window shop provision that prevented the company from soliciting offers, because any outside party could obtain access to the debtor's books and records. *In re Crowthers McCall Pattern, Inc.*, 114 B.R. at 889. The court reasoned that "provisions such as these may deter other bidders somewhat in view of the difficulty in securing acceptance of non-consensual plans. But such limited deterrence is often necessary to bring prospective bidders to the table with serious bids." *Id.*

This reasoning applies equally well to the BT Proposal, which also included both a break-up fee and a window shop provision. Bidders other than BT, including Penguin and Hallwood, have been, and will continue to be, able to investigate Integrated's assets. Admittedly, the BT Proposal may have deterred some bidding, but such deterrence must be weighed against the value of securing BT's commitment to a plan of reorganization for Integrated. The bankruptcy court found that Integrated properly balanced these conflicting concerns.

Appellant wrongly equates general principles of bankruptcy law with the fiduciary rules that apply in corporate control cases outside bankruptcy. "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 130 (Bankr.N.D.Ga.1988). However, the debtor's duty to obtain the highest price from a sale of assets for the estate in bankruptcy is entirely different from the duties which management owes to shareholders when conducting an auction for a company, whether the company is in bankruptcy or not.

The BT Proposal did not generate heightened fiduciary obligations, because it did not constitute an auction. The enhanced fiduciary duties invoked by appellant relate only to the proper conduct of an auction. In an auction, the officers and directors of Integrated would have a duty, analogous to the duty in *Revlon*, to attract the highest price for the estate. However, an auction of Integrated has not yet begun, and there is no evidence in the record to show that Integrated will not be able to achieve the highest price when, and if, an auction begins.

The officers and directors satisfied even a heightened fiduciary duty, because they discussed with all of the bidders, including Hallwood and Penguin, aspects of other bids "in order to move the bidding process to higher levels." (11/25/91 Hr'g Tr. at 55) Similarly, they provided to Penguin information which they did not provide to BT. The Bankruptcy Court was unimpressed by and rejected the Sub–Debt Committee's arguments that Integrated limited the access of other bidders to information. The record does not disclose evidence of any self-dealing. Therefore, the Break-up Fee likely would survive even a test of heightened scrutiny.

## B.

The second question is whether the Break-up Fee hampered, rather than encouraged, bidding. By design, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode ... to attract other bidders to the auction." *In re Financial News Network*, 126 B.R. at 154 n. 5. Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable. In fact, because the directors of a corporation have

a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value. *CRTF Corp. v. Federated Dep't Stores Inc.*, 683 F.Supp. at 441.

■■■ Outside bankruptcy, the business judgment rule normally applies to the board's use of a defensive strategy, such as a break-up fee. *See, e.g., Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173, 181 (Del.1986); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985). However, when a break-up fee is part of a response to a hostile tender offer, "there is an enhanced duty which calls for judicial examination at the threshold before the protection of the business judgment rule may be conferred." *Unocal*, 493 A.2d at 954. The rationale for this "enhanced duty" is that shareholders facing a hostile tender offer are entitled to limit a break-up fee to an amount that encourages bidding to the extent necessary, but that does not jeopardize the value of the target company. *See Revlon*, 506 A.2d at 184 ("Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity.").

Appellant asserts that the "enhanced duty" standard should apply to the BT Proposal. However, the "enhanced duty" analysis has been limited to cases involving hostile tender offers. *See* The Business Judgment Rule at 117–177. In contrast, the bankruptcy courts generally presume that the board's decision to agree to a break-up fee was a valid exercise of its business judgment. *In re Integrated Resources*, 135 B.R. at 753. The "enhanced duty" standard might well apply to a hostile tender offer situation in a bankruptcy court. However, previous bankruptcy cases have not presented such a situation, and neither does this case.

■■■ Further, the business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large. One bankruptcy court has asserted that "if such a fee is too large ... the fee is not protected by the business judgment rule ... and is thus subject to court review." *In re 995 Fifth Ave. As-*

*soc.*, 96 B.R. at 28. The cases do not support this approach. Although an exorbitant break-up fee might chill bidding to the detriment of creditors, the amount of the fee is merely one of many factors to consider under the business judgment rule. As Judge Posner recently observed in another context, "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir.1992) (reversing and remanding a district judge's award of attorney fees). Likewise, it is not the function of judges to determine the medieval just break-up fee.

■■■ In assessing the incentive effect of the Break-up Fee, a court should determine whether the dollar amount of the fee is so substantial that it has a "chilling effect" on other prospective bidders. *See CRTF Corp. v. Federated Dep't Stores, Inc.*, 683 F.Supp. at 440 (break-up fee that did not chill bidding was not illegal). In making this determination, the court should consider whether the proposed acquiror attracted other bidders or simply received a potential windfall. Break-up fees and other strategies may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *Samjens Partners*, 663 F.Supp. at 624. However, such strategies are inappropriate if the directors "knew or should have known" that bidding would cease as a result. *See Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 277 (2d Cir.1986).

The bankruptcy court found that the Break-up Fee would "enhance rather than detract from the bidding process." *In re Integrated Resources*, 135 B.R. at 753. The record supports this finding. BT prompted Integrated to establish a data room. BT led both the investigation of Integrated and the bidding. As a result, BT was both an active bidder and a magnet for other bids. Moreover, the BT Proposal allows for competing offers before Integrated and BT reach an agreement. In fact, one bidder, Penguin, has not withdrawn its offer and is continuing to negoti-

ate with the Senior Committees and Integrated. The bidding process is far from over, and the Senior Committees and Integrated have expressed a desire for further bidding.

A break-up fee may also ensure that a bidder does not retract its bid. *See Samjens Partners*, 663 F.Supp. at 625 (board was justified in granting break-up fee when it realized that the bidder would withdraw without the fee). BT spent a substantial portion of its available funds on the investigation of Integrated. BT requested the Break-up Fee, because reaching a Definitive Agreement with Integrated "will require substantial additional time and effort ... we can no longer justify spending any more money giv[en] this process will not end until the final minute." (11/25/91 Hr'g Tr. at 157) (testimony of Bruce Tully, managing director of BT Securities Corporation).

Pursuant to the BT Proposal, if BT fails to proceed in good faith or unreasonably abandons its proposal, it will not receive a fee. If, on the other hand, the fee ultimately becomes payable because a higher bidder than BT prevails, then in all probability BT will have attracted that bidder and thus earned its fee. The fee structure is graduated so that any amounts paid will be significantly lower absent a binding agreement between BT and Integrated. In these ways, the BT Proposal properly balances the Sub-debt Committee's concern

that the fee is excessive against Integrated's concern that BT might withdraw from bidding.

In attempting to define the proper boundaries of a break-up fee and to describe the function of its recipient, the parties have exploited the pastoral metaphor of the "stalking horse." According to Webster's, a "stalking horse" is "a horse or figure like a horse behind which a hunter stalks game [or] something used to cover up a secret project, mask, pretense." Webster's Third New International Dictionary, Unabridged 2221 (1986). Appellant argues that the Break-up Fee was improper because BT was not a "stalking horse." *See* Appellant's Br. at 32. Appellees argue the opposite. *See* Appellee Integrated's Br. at 36, Appellee BT's Br. at 9. Even the bankruptcy court noted that break-up fees "may encourage the making of what is colloquially referred to as a 'stalking horse' offer." *In re Integrated Resources*, 135 B.R. at 750.

■■■ The term "stalking horse" is not merely colloquial; it is also both underinclusive and misleading as a purported justification for a break-up fee. Presumably, a "stalking horse" bidder would submit an early phony bid to absorb the initial costs and consequences of bidding, while acting in behalf of another party. BT did not play such a role. Therefore, when the parties question whether BT served as a "stalking horse," they ask the wrong question.[2] The

---

**2.** The Supreme Court has warned that "[c]atch words and labels ... are subject to the dangers that lurk in metaphors and symbols, and must be watched with circumspection lest they put us off guard." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 253, 109 S.Ct. 1026, 1036, 103 L.Ed.2d 290 (1989) (citing *Henneford v. Silas Mason Co.*, 300 U.S. 577, 586, 57 S.Ct. 524, 528, 81 L.Ed. 814 (1937)). Nevertheless, courts seem to enjoy framing bankruptcy issues in colorful, but misleading, metaphor. For example, the term "stalking horse" has appeared in a variety of odd contexts. *See, e.g., In re El Paso Pharm., Inc.*, 130 B.R. 492, 496 (Bankr.W.D.Tex. 1991) ("[t]he jury issue thus turns out to be a stalking horse"); *In re Louis Fleet*, 122 B.R. 910, 917 (Bankr.E.D.Pa.1990) (rejecting a "last ditch effort" of a debtor to use "his wife as a stalking horse").

Bankruptcy cases teem with other mixed and maltreated metaphors. *See, e.g., United States*

*v. Nelson*, 969 F.2d 626 (8th Cir.1992) ("trustee here was attempting to 'gouge substantive congressional-given rights from the eyes of debtors' "); *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 472–73 (6th Cir.1988) ("Emerson's dictum that 'a foolish consistency is the hobgoblin of little minds' cuts no ice in this context.").

Food-related metaphors are common. *See, e.g., In re Central Ice Cream Co.*, 114 B.R. 956, 960 (D.N.D.Ill.1989) (referring to the bankruptcy judge's metaphor of the "egg" of conflict); *In re Jeffrey B. Stone*, 119 B.R. 222, 234 n. 18 (Bankr.E.D.Wash.1990) ("An appropriate, if informal metaphor, is to compare the exemption to a wedge of Swiss cheese."); *In re Charles Richard Snow*, 92 B.R. 154, 158 n. 3 (D.W.D.Va. 1988) (extending the Swiss cheese metaphor to "argue that the wedge of Virginia cheese contains too high a ratio of holes to cheese"); *C.I.T. Corp. v. A & A Printing, Inc.*, 70 B.R. 878, 882 (D.M.D.N.C.1987) ("The familiar metaphor of a

appropriate question is whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders. Despite the confusing reference to a "stalking horse," the bankruptcy court correctly concluded that the Break-up Fee encouraged bidding, because BT served all three of the above functions.

### C.

■ The third question is whether the amount of the Break-up Fee was unreasonable relative to the proposed purchase price. Appellant claims that the fee was unreasonably high, given BT's limited risk. Appellant's Br. at 35–38. A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. "When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *In re 995 Fifth Ave. Assoc.*, 96 B.R. at 28.

During the November 25, 1991 hearing, Judge Blackshear expressed concern about the size of the Break-up Fee. He suggested that the parties reduce the fee to the scale of break-up fees which courts had authorized in the past. BT, Integrated, and the Senior Committees followed his advice. They met during a short recess and agreed to reduce the fee by approximately one-third. *In re Integrated Resources*, 135 B.R. at 752. The bankruptcy court then approved the Break-up Fee, as modified. The willingness of the parties to decrease the original fee convinced the bankruptcy court that the Break-up Fee was permitted under the business judgment rule. *Id.* at 753.

In its final form, the Break-up Fee ranged from $6 million to zero. At its maximum, the fee was only 1.6 percent of the proposed purchase price of $565 million, or 3.2 percent of BT's "out-of-pocket" expenses (excluding Integrated's expected cash on hand). *See id.* at 752. Appellant's own expert testified that the average break-up fee in the industry is 3.3 percent, nearly the same percentage as the fee in the modified BT Proposal. (11/25/91 Hr'g Tr. at 202) These calculations result from exceedingly complex determinations of fact, and the bankruptcy court found that the percentage fee was in accord with industry averages.

■ Furthermore, the Break-up Fee is reasonable in relation to the risk and expenses BT assumed. A court should consider the prospective buyer's investment of both time and money when determining whether a break-up fee is reasonable. In general, a break-up fee is permissible if reasonably related to the bidder's efforts

pie is instructive."); *In re Tri–Cran,* 98 B.R. 609, 620 (Bankr.D.Mass.1989) (learning "through the grapevine" in the cranberry industry).

Zoological metaphors abound. *See, e.g., In re Financial News Network,* 126 B.R. at 154 n. 5 (conferring the title "tethered goat" on a break-up fee recipient); *Mellon Bank v. Metro Communications,* 945 F.2d 635, 646 (3d Cir.1991) ("the target firm may not at all reflect the Elizabethan deadbeat, but may in fact wind up as the sacrificial lamb"); *In re Universal Profile, Inc.,* 5 B.R. 572, Bankr.L.Rep. (CCH) ¶ 67,696 (N.D.Ga. 1980) ("This court is not favorably inclined toward making [the subsidiary] a sacrificial lamb for its parent company."); *In re Willie Charles Jones,* 105 B.R. 1007, 1012 (D.N.D.Ala.1989) (remarking that "'Chapter 26' ... is an animal as different from 'Chapter 20' as an elephant is from a giraffe"); *In re Assembled Interests Corp.,* 117 B.R. 31, 32 (Bankr.N.H.1990) (acknowledging that "calling an elephant a giraffe does not make the animal any less an elephant," but

also noting that "[t]his is an obvious but irrelevant truth"); *In re Robert James Johnson,* 80 B.R. 953, 962 (Bankr.D.Minn.1987) ("This test is popularly phrased via the fine, homely folk adage of 'The pig gets fattened, but the hog gets slaughtered.'"); *Dolese v. United States,* 605 F.2d 1146, 1154 (10th Cir.1979) (employing a variant: "There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered"); *In re Donald J. Falconer,* 79 B.R. 283, 289 (D.W.D.Mich.1987) (suggesting the allegory of counting and burying cattle to explain the "ontological demise" of cattle which "disappeared in almost 'Orwellian fashion' [and] became, in a word, 'uncattle'").

The reference to Orwell is particularly jarring because that author, a master of the language, warned against the use of stale metaphors as a substitute for clearly expressed thought. IV The Collected Essays, Journalism and Letters of George Orwell 127–40, esp. 130 (Sonia Orwell and Ian Angus, eds. 1968).

and the transaction's magnitude. *Cottle v. Storer Communication Inc.*, 849 F.2d 570, 578 (11th Cir.1988). This approach encourages the appropriate level of bidding. If a prospective bidder knows that the debtor will agree to a break-up fee after the bidder has investigated the debtor, the bidder is more likely to pursue a bid. If, on the other hand, a prospective bidder knows that courts prevent the debtor from paying a break-up fee, then it is more likely to abandon its bid, or, even worse, never to explore a bid in the first place.

Appellant argues that the Break-up Fee is premature and unreasonable because BT had not entered into a binding agreement to purchase Integrated at the time of the BT Proposal. As a result, BT could receive the Break-up Fee as a windfall, and thereby waste Integrated's assets. Appellant claims that, as a rule, the courts award break-up fees only to bidders who have signed binding agreements.

Although the cases do not directly support break-up fees in the absence of a binding agreement, neither do they ban such an arrangement. Furthermore, there is some judicial support for break-up fees even when a prospective purchaser has signed only a letter of intent, not a binding agreement. In another case, Judge Blackshear, the bankruptcy judge below, approved payment of a $250,000 break-up fee which was provided for in letter of intent to purchase certain assets of the debtor subject to execution of a binding agreement. *In re Rosemar Silver Co., Inc.*, No. 89–B–12171 (Bankr.S.D.N.Y. Apr. 25, 1990). A Colorado bankruptcy court recently approved an agreement which provided that a company would pay $100,000 to a prospective bidder if the company sold certain assets to a higher bidder, even though the bidder had signed only a letter of intent, not a binding agreement. *In re Twenver, Inc.*, No. 90–11846 (Bankr.D.Colo. Apr. 15, 1991). In contrast, an Ohio court denied a debtor's motion to enter into a letter of intent to sell assets, including a break-up fee agreement, stressing that the break-up fee was to be paid "independent of any transactional costs to be incurred" by the prospective purchaser. *In re Hupp Industries, Inc.*, 140 B.R. 191, 195 (Bankr. E.D.Ohio 1992).

No court other than a federal bankruptcy court has ruled on this issue. That few bankruptcy courts have upheld break-up fees without a binding acquisition agreement reflects only that this particular type of fee is rare. Furthermore, a rule that a break-up fee may not be awarded unless the debtor and the prospective purchaser have signed a binding agreement is toothless. A prospective bidder could easily circumvent such a rule with the following strategy: sign a "definitive agreement" to acquire Integrated for a peppercorn, an option voidable at Integrated's discretion, and include a provision for a break-up fee in case the bidder is outbid. To avoid such perverse incentives, the better approach, and the one followed below, is to weigh the reasonableness of the break-up fee, considering the bidder's expenditures and the transaction's complexity.

Viewed as a whole, the BT Proposal contains many of the principal terms of a binding agreement. It was the culmination of almost a full year of inquiry, investigation, and negotiation. Integrated's assets and the structure of the transaction were both highly complex. Of course, a court may decline to approve a break-up fee if that fee seems to be part of a plan to thwart the efforts of an unwanted suitor for reasons unrelated to the maximization of shareholder profit. *See, e.g., Revlon v. MacAndrews & Forbes Holdings*, 506 A.2d 173, 185 (Del.1986). That court rejected a $25 million cancellation fee intended to make the transaction prohibitively expensive to an unwanted suitor and to arrest further bidding. *Id.* Nevertheless, the bankruptcy court correctly found that the Break-up Fee was sufficiently different from the fee at issue in *Revlon* to warrant a finding of reasonableness.

## IV.

Appellant argues that the bankruptcy court abused its discretion by denying both the Sub–Debt Committee's November 13, 1991 request for an adjournment and the

November 25, 1991 motion for an order to reschedule the hearing. Although the parties conducted discovery from November 18, 1991 through November 22, 1991, the Sub–Debt Committee claims it needed more discovery in order to respond adequately to the BT Motion.

 The standard of review of a bankruptcy court determination concerning the scope of discovery and admission of deposition transcripts at a hearing is whether the bankruptcy court abused its discretion. *See In re Int'l Distrib. Centers, Inc.,* 103 B.R. 420, 422 (S.D.N.Y.1989); *In re Union Bank of the Middle East, Ltd.,* 127 B.R. 514, 523 (E.D.N.Y.1991). The bankruptcy court's decision not to permit additional discovery may be reversed only for abuse of discretion. *In re CIS,* No. 91–CIV–6075, 1991 WL 253777, at *2, 1991 U.S.Dist. LEXIS 16686, at *4 (S.D.N.Y. Nov. 19, 1991); *In re Int'l Distrib. Centers, Inc.,* 103 B.R. 420 (Bankr. S.D.N.Y.1989). In the Second Circuit, trial courts have substantial discretion in controlling the scope and nature of discovery. *Gonzalez v. St. Margaret's House Hous. Dev. Fund,* 880 F.2d 1514, 1519 (2d Cir. 1989). Furthermore, because Federal Rule of Civil Procedure 26(c) applies to the federal bankruptcy courts, a bankruptcy court may limit the scope of discovery to specific issues and may "exercise this authority aggressively [where] an immense amount of time and effort has already been expended by both sides". *Id.* Accordingly, a finding that discretion has been abused usually requires either the violation of a " 'substantial right,' … or '… fundamental unfairness in the trial of the case.' " *Public Loan Co., Inc. v. FDIC,* 803 F.2d 82, 86 (3d Cir.1986) (citations omitted).

 The issue for the November 25, 1991 hearing was narrow: should the bankruptcy court approve the Break-up Agreement? In addition, the Sub–Debt Committee had ample opportunity during the previous months to conduct discovery regarding the plan negotiations generally. Therefore, the bankruptcy court was entitled to limit discovery.

Because discovery was ample, the bankruptcy court did not violate a substantial right or cause any fundamental unfairness. During the week before the hearing, the Sub–Debt Committee deposed four witnesses for the equivalent of a day each, and thousands of pages of documents were produced. In fact, the Sub–Debt Committee presented a fully developed case at the November 25, 1991 hearing, which encompassed many hours of testimony and documentary evidence, and generated over 260 pages of transcript. *In re Integrated Resources,* 135 B.R. at 752.

 Appellants also claim that the bankruptcy court abused its discretion in not admitting into evidence the full deposition transcripts of the principals of Integrated and BT. The bankruptcy court admitted only those portions of the transcripts specifically published at the hearing. "The use of a deposition at trial is a matter of discretion for the trial court and will not be overturned except for an abuse of that discretion." *In re Union Bank of The Middle East, Ltd.,* 127 B.R. 514, 523 (E.D.N.Y.1991); *Bobb v. Modern Products, Inc.,* 648 F.2d 1051, 1055 (5th Cir.1981). If a court finds that evidence is cumulative or redundant, it can use its discretion to exclude it. *Int'l Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc.,* 544 F.2d 105, 109 (2d Cir.1976).

 The transcripts at issue are each over 200 pages long. Counsel did not articulate any reason why the portions of these transcripts that were not used at the hearing were anything but cumulative. The bankruptcy court did not prevent the Sub–Debt Committee from publishing any specific portion of the testimony that was relevant to its case. Accordingly, the bankruptcy court justifiably exercised its discretion to limit discovery and to exclude cumulative evidence.

\* \* \*

For the reasons stated above, the bankruptcy court's order is affirmed.

SO ORDERED.