**In the Matter of TIARA MOTORCOACH CORPORATION, Debtor.**

**Bankruptcy No. 97–32500/HCD.**

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

July 25, 1997.

Michael B. Watkins, South Bend, IN, for debtor.

Alexander Edgar, Office of United States Trustee, South Bend, IN.

Brian S. Rosen, Weil, Gotshal & Manges, New York City, for Mark III Industries, Inc.

William A. Thorne, Elkhart, IN, Mark E. Wagner, Bremen, IN, Co–Counsel for Official Unsecured Creditors Committee.

Jeffrey A. Johnson, May, Oberfell & Lorber, South Bend, IN, for Scott Stanton and SSIA, Inc.

R. William Jonas, Jr., Hammerschmidt, Amaral & Jonas, South Bend, IN, for Heller Financial, Inc.

## MEMORANDUM OF DECISION

ROBERT K. RODIBAUGH, Bankruptcy Judge.

On July 17, 1997, Tiara Motorcoach Corporation ("Tiara"), debtor herein, filed a Motion to Set Expedited Hearing for Approval of Breakup Fees ("Motion for Breakup Fee"). Tiara also filed a motion captioned "Emergency Motion for an Order Pursuant to Sections 363 and 365 of the Bankruptcy Code, Authorizing the Sale of Certain Operating and Other Assets of the Debtor–in–Possession Free and Clear of Liens, Claims and Encumbrances, Including Approval of The Payment of A Breakup Fee" (hereinafter referred to as the "Motion for Sale"). As discussed more fully below, five entities filed separate objections/responses to the Motion for Sale concerning the approval of the breakup fee arrangement.[1] On July 24, 1997, the court held an expedited hearing with regard to Tiara's Motion for Sale, during which it only addressed the proposed breakup fee. Near the conclusion of the expedited hearing, Mark III Industries, Inc. ("Mark III"), a prospective purchaser of Tiara, sought a decision from this court as to whether it would approve the proposed breakup fee. Because of the number of objections filed and the apparent split in authority concerning the standard for determining the permissibility of a breakup fee, the court felt compelled not to rule from the bench and thus took this matter under advisement.

### Jurisdiction

After reviewing the record, this court concludes that the matter before it is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (N) over which this court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This entry shall serve as findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52, which is made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7052.

### Background

Based upon its review of the record, the court makes the following findings of fact:

1. On July 10, 1997, Tiara and Mark III signed a letter agreement ("Letter of Intent"), in which Mark III agreed "to pursue" 1) the purchase of all assets related to Tiara's so-called international and commercial businesses, all of Tiara's intangible assets, and all service and parts inventory, and 2) the assumption of specified liabilities. The purchase price that the parties set forth in their Letter of Intent was $2.8 million in cash plus the assumption of certain liabilities. During the expedited hearing, Tiara estimated the value of the liabilities to be $800,000 for the accounts payable of two divisions and $20,000 for certain leases. Tiara could not assign a dollar amount to the warranty claims which Mark III also proposed to assume.

Provision 12 states that except for the provisions entitled Press Releases, Timing, and Expenses, the Letter of Intent "is not intended to be a legally binding agreement between the parties hereto, and neither party shall be obligated to complete the transaction contemplated hereby except upon the completion of negotiations and the execution and delivery of a definitive acquisition agreement." Letter of Intent, at 5. Provision 6(a)

---

1. The court scheduled the expedited hearing for the Motion for Sale on August 8, 1997.

required "[e]xecution of a mutually satisfactory definitive agreement between Mark III and Tiara setting forth the terms of the transaction on or before July 24, 1997." Letter of Intent, at 2. As of the expedited hearing, Tiara and Mark III had not executed a definitive acquisition agreement.

2. Provision 11 of the Letter of Intent sets forth the proposed breakup fee:

*Expenses.* Mark III and [Tiara] will each pay their respective expenses ... in connection with the transaction contemplated hereby (whether consummated or not); *provided, however,* that, the event that the Company consummates a sale of the Acquired Business, in whole or in part, or the equity of the Company to an entity other than Mark III, Tiara will pay all expenses incurred by Mark III and its representatives in connection with this transaction up to $100,000.00 and pay an additional fee to Mark III of $200,000.00 (the "Breakup Fee"); and, *provided, further,* that, if the transaction is not consummated because the Bankruptcy Court declines to enter the Sale Order, Tiara will pay all expenses incurred by Mark III and its representatives in connection with this transaction up to $100,000.00 and all such expense reimbursement obligations shall be administrative expense claims in any Company bankruptcy proceeding.

Letter of Intent, at 5.

3. On July 11, 1997, Tiara filed its voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code. Tiara and Mark III contemplated and required such an action in the Pre–Closing Covenants provision of the Letter of Intent, namely 7(ix). In its voluntary petition, Tiara listed approximately $15 million in assets and $22 million in liabilities. Tiara has not filed its Statement of Financial Affairs and Schedules, as these documents are not yet due. Nevertheless, during the expedited hearing, Tiara informed the court that Heller Financial, Inc. ("Heller") maintained an $11 million claim secured by all assets other than the chassis; Scott Stanton and SSIA, Inc. ("Stan-

ton") held a $1.1 million secured claim and a $2.6 million unsecured claim; Ford Motor Credit Company held a $10 million claim secured by approximately 400 chassis; and Chrysler Financial Corporation maintained a $7 million claim in approximately 275 chassis.[2]

4. On July 11, 14 and 16, 1997, the court held expedited hearings on Tiara's Motion for Emergency Debtor–In–Possession Financing. In its order captioned "Third Agreed Order Granting Authority to Debtor–In–Possession to Obtain Emergency Financing from Heller Financial, Inc., and Setting Further Hearing" and dated July 18, 1997, the court authorized, but did not obligate, Heller to provide up to $2 million in emergency post-petition interim financing to Tiara. Heller had previously provided alternate financing to Tiara in January, 1997.

5. During the expedited hearing on the Motion for Sale concerning the proposed breakup fee, Tiara stated that prior to filing bankruptcy, it attempted to reorganize and made inquiries concerning the sale of the business or components thereof. According to Tiara, only Mark III, a leading conversion van company in the country, expressed an interest in purchasing certain assets of the business, as evidenced through the Letter of Intent. Nevertheless, Tiara stated that since filing the Motion for Sale, it had received requests for bid packages from three other companies.

Tiara and Mark III reiterated the critical nature of the bankruptcy filing and the proposed sale. In addition, both stated that Heller may withdraw the interim financing if Mark III ended its negotiations with Tiara. Heller concurred, stating it would have a "material issue" if Mark III "walks away," in that Heller's interest in supplying the emergency post-petition financing was "to get Tiara to a point of sale." Tiara and Mark III contended that if Heller withdrew its financing, Tiara would be required to cease its business operations, terminate 109 employees and liquidate its assets at distressed values.

---

**2.** The court notes that GMAC also has a secured claim, though none of the parties at the expedited hearing could specify a dollar amount.

Tiara also indicated that the "sale to [Mark III] represents the only realistic opportunity for Tiara to sell these assets for maximum value" and that the breakup fee is "fair and reasonable in that the Debtor's exposure in such event is capped and further that the Buyer has been placed as a 'stalking horse' for all other potential bidders, yet Buyer has incurred and will continue to incur expenses and fees in connection with the pursuit of this transaction." Motion for Breakup Fee, at 2. Furthermore, Tiara stated that the breakup fee was in the best interests of the estate and its best business judgment.

6. Several parties, as well as the United States Trustee, filed objections/responses to the Motion for Sale, as it concerned the approval of the proposed breakup fee, and argued their objections at the expedited hearing. To summarize:

a. On July 23, 1997, the Official Committee of Creditors Holding Unsecured Claims ("Committee") filed its objection. The Committee contended that the Letter of Intent between Tiara and Mark III did not constitute a binding agreement, and that it would be inappropriate for the court to agree to the breakup fee provision without reviewing a finalized binding agreement. In addition, the Committee argued that the amount of the breakup fee was excessive; the breakup fee chilled bidding; and the fee did not further the policy reasons underlying the Bankruptcy Code.

b. On July 23, 1997, the United States Trustee filed a limited objection requesting that the court 1) analyze and apply the appropriate standard for determining whether a breakup fee should be approved; 2) determine the reasonableness of the $200,000.00 breakup fee proposed in the Letter of Intent and the value that the fee would add to the estate; and 3) consider whether the provision, deeming the payment to Mark III by Tiara of up to $100,000.00 in expenses as an administrative claim under § 503(b), is permissible.

c. On July 23, 1997, Heller filed a Response to the Motion for Sale. During the expedited hearing, Heller indicated that if approved, the breakup fee should not obtain priority status over its claims.

d. On July 24, 1997, Tredit Tire & Wheel Company, Inc. ("Tredit") filed its objection contending that the breakup fee was unreasonable, would chill bidding, and "would divert an undue portion of any sales proceeds from a bidder or bidders whose bid(s) exceed Buyer's away from the creditors to Buyer."

e. On July 24, 1997, Stanton filed an objection to the Motion for Sale with regard to the proposed breakup fee. Questioning whether the Letter of Intent constituted an arms-length transaction, Stanton, during the expedited hearing, stated that Tiara and Mark III knew and anticipated that Tiara would file its voluntary petition the day after executing the Letter of Intent. In addition, Stanton noted that Provision 6(f) of the Letter of Intent conditioned the closing on the execution of employment agreements between Mark III and two officers of Tiara. On the basis of the foregoing, Stanton contended that the breakup fee should not be approved due to the implication of selfdealing. Mark III indicated that the provision was necessary because they required Charles Craig's and Robert Stein's expertise in supervising the workforce.

Stanton contended that a breakup fee was unnecessary in a liquidating, as opposed to a reorganizing, chapter 11 case. Stanton stated that the breakup fee itself adds no value to the estate, would have a chilling effect on bidders because it would create an "uneven playing field" for other bidders, and is unreasonable in amount. In addition, Stanton questioned what Mark III had given the estate to justify the $200,000.00 breakup fee. To this point, Mark III argued that if the parties had not entered into the Letter of Intent, Tiara would have immediately ceased operations. No party submitted testimony or documentation of the risk, time, effort and/or expense that Mark III contributed to the proposed sale.

Furthermore, Stanton echoed the Committee's statement that approval of the breakup fee is inappropriate in light of the fact that Tiara and Mark III have only entered into a non-binding Letter of Intent, not a definitive sale agreement. Similarly, Stanton reiterated the United States Trustee's belief that the

payment of expenses to Mark III should not be granted an administrative priority status because the Bankruptcy Code does not permit it.

### Discussion

■ The parties have asked this court to consider two issues: 1) whether the proposed $200,000.00 breakup fee is permissible and reasonable; and 2) can Mark III's potential reimbursement of up to $100,000.00 in expenses be treated as an administrative expense under § 503(b) of the Bankruptcy Code. Turning to the first issue, a breakup fee is a "fee paid to the potential purchaser of business assets when the transaction is not consummated, most commonly when the seller accepts a later bid." *In re Twenver, Inc.,* 149 B.R. 954, 955 (Bankr.D.Colo.1992) (citing *In re Integrated Resources, Inc.,* 135 B.R. 746, 750 (Bankr.S.D.N.Y.1992), *aff'd* 147 B.R. 650 (S.D.N.Y.1992), *appeal dismissed,* 3 F.3d 49 (2d Cir.1993)). Courts agree that such breakup fees are common in non-bankruptcy contexts. In bankruptcy matters, though, courts disagree as to the appropriate standard for determining whether to approve a breakup fee.

Two different standards for engaging in this analysis have emerged. In *The Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993), the court found that the business judgment rule[3] applied in nonbankruptcy contexts and thus relied upon that standard to determine whether the proposed breakup fee at issue was appropriate. Using the business judgment rule as its foundation, the court specifically analyzed the following questions: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3)

is the amount of the fee unreasonable relative to the proposed purchase price?" *Id.* at 657. In *S.N.A. Nut Company,* 186 B.R. 98, 104 (Bankr.N.D.Ill.1995), the court articulated an alternate standard, namely "whether the interests of all concerned parties are best served by such a fee." *See also In re America West Airlines, Inc.,* 166 B.R. 908, 912 (Bankr.D.Ariz.1994); *In re Hupp Industries, Inc.,* 140 B.R. 191, 194, 196 (Bankr.N.D.Ohio 1992).[4] In addition, the *S.N.A.* court stated that "bankruptcy courts should carefully scrutinize breakup fees to be sure that, following the underlying policy guiding § 363, revenues will be maximized." 186 B.R. at 104.

■ This court agrees with the position taken in *S.N.A., America West, and Hupp.* A sale pursuant to § 363 of the Bankruptcy Code[5] is not in the ordinary course of business, and the business judgment of the debtor should not be solely relied upon. Rather, a court should insure that revenues are maximized and that the best interests of the debtor's estate, creditors and equity holders are furthered. Therefore, "[t]he proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *America West,* 166 B.R. at 912.

■ Applying this standard, the court concludes that the proposed $200,000.00 breakup fee does not serve and protect the interests of the estate, creditors and equity holders. Tiara and Mark III have not entered into a legally binding agreement regarding the purchase of certain assets and assumption of certain liabilities. No party has had the opportunity to review the terms and conditions of such an agreement, as a definitive sale agreement has not been completed and circulated. The only "agreement" in evi-

---

**3.** The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.* at 656 (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985)).

**4.** In *Hupp,* the court also set forth seven factors to consider in addressing the issue of breakup fees. *See Hupp,* 140 B.R. at 194.

**5.** Section 363(b) of the Bankruptcy Code provides, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (Callahan 1997).

dence is the Letter of Intent, under which Mark III has minimal obligation. To rule on the issue of breakup fees in this situation would be premature. In addition, the court has not received sufficient evidence to determine the reasonableness of the proposed fee. Based upon the statements made during the expedited hearing, Mark III's proposed purchase price is $2.8 million in cash, approximately $800,000 in accounts payable and approximately $20,000 in leases. The court has no information concerning the value of the warranties or other liabilities that Mark III agreed "to pursue" to assume and thus cannot calculate a percentage of the breakup fee to the relative purchase price.[6]

The court also finds that this breakup fee arrangement would chill bidding. Tiara has not created post-petition bidding procedures or solicited post-petition bids. The court recognizes that three other entities requested bid packages after the filing of the Motion for Sale. However, these entities did so without solicitation and without the approval of the proposed breakup fee.[7] To approve the fee and thereby require companies to offer at least $3.1 million to overcome Mark III's proposed purchase price and breakup fee/expenses would not encourage bidding.[8] Furthermore, the court did not hear testimony or receive documentation as to the time, effort, expense and risk that Mark III contributed to the proposed sale. The court acknowledges both Mark III's statement that without the Letter of Intent, Tiara would have ceased operations at least fourteen days ago, the date of the filing of the bankruptcy petition, and the prior testimony concerning the critical nature of the bankruptcy. Yet,

without evidence concerning Mark III's time, effort, expense and risk, the court cannot determine whether the breakup fee is justified.

Based upon the foregoing, the court denies Tiara's Motion for Sale, but only as to its request for approval of breakup fees. IT IS

SO ORDERED.

## JUDGMENT

In accordance with its Memorandum of Decision entered this date, the court denies Tiara Motorcoach Corporation's Emergency Motion for an Order Pursuant to Sections 363 and 365 of the Bankruptcy Code, Authorizing the Sale of Certain Operating and Other Assets of the Debtor–in–Possession Free and Clear of Liens, Claims and Encumbrances, Including Approval of The Payment of A Breakup Fee, ONLY as to its request for approval of the payment of a breakup fee. IT IS

SO ADJUDGED.

---

6. The court notes that the *Twenver* court stated "the 10% [breakup fee] sought [in that case] greatly exceeds the 1% to 2% fees found to be reasonable in the majority of cases approving such fees." *Twenver,* 149 B.R. at 957; *see also Integrated Resources,* 147 B.R. at 662 (the court heard expert testimony that the industry standard on average is 3.3 percent. The court ultimately accepted a breakup fee that was 1.6 percent of the purchase price).

7. The court disagrees with Tiara's characterization of Mark III as a "stalking horse." The court heard no testimony and received no documentation that Mark III conducted due diligence which other entities have benefitted and/or could benefit from in preparing a bid. Similarly, Mark III

does not satisfy the *Integrated Resources* definition, pursuant to which "a 'stalking horse' bidder would submit an early phony bid to absorb the initial costs and consequences of bidding, while acting in behalf of another party." *Integrated Resources,* 147 B.R. at 661.

8. Based upon its ruling, the court need not determine whether the Letter of Intent was an arms-length transaction or the product of self-dealing. In addition, because it answers the first issue in the negative, the court does not address whether the payment of up to $100,000.00 in Mark III's expenses can be treated as an administrative expense under § 503(b). The court notes, though, that the *Hupp* court's analysis is persuasive. See *Hupp,* 140 B.R. at 196–97.