### In re GLOBAL CROSSING LTD., et al., Debtors.

### No. 02–40188 (REG).

United States Bankruptcy Court, S.D. New York.

July 24, 2003.

---

9. Letter Obj. of Reuters at 1 (ECF # 3322).

10. Letter Obj. of Dow Jones at 1 (ECF # 3320).

11. *Id.*

Weil, Gotshal & Manges, LLP, by Michael F. Walsh, Esq., Joseph S. Allerhand, Esq., Paul M. Basta, Esq., Anthony J. Albanese, Esq., New York City, for the Debtors.

Shearman & Sterling, LLP, by James L. Garrity, Jr. Esq., New York City, for the Joint Provisional Liquidators.

Brown Rudnick Berlack Israels, LLP, by Edward S. Weisfelner, Esq., Joseph F. Ryan, Esq., New York City, for the Official Committee of Unsecured Creditors.

Greenberg Traurig, LLP, by Thomas J. Weber, Esq., New York City, Special Conflicts Counsel for the Official Committee of Unsecured Creditors.

Milbank, Tweed, Hadley & McCloy LLP, by Alan S. Brilliant, Esq., George S. Canellos, Esq., Thomas A. Arena, Esq., Deirdre Ann Sullivan, Esq., New York City, for JP Morgan Chase Bank, in its capacity as Administrative Agent for the Senior Secured Lenders.

Kirkland & Ellis, by Marc Kieselstein, Esq., Scott R. Samay, Esq., New York City, Counsel for XO Communications, Inc.

McDermott, Will & Emery, by David C. Albalah, Esq., New York City, for IDT Corporation.

James B. Comey, United States Attorney, by Sean H. Lane, Esq., Assistant U.S. Attorney, New York City, for the United States of America.

Latham & Watkins, LLP, by Martin N. Flics, Esq., New York City, for Singapore Technologies Telemedia Pte Ltd.

DECISION ON MOTION FOR AUTHORITY TO AMEND PURCHASE AGREEMENT, FOR AUTHORITY TO GRANT RELEASES, AND FOR EXTENSION OF EXCLUSIVITY[1]

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in a case under chapter 11 of the Bankruptcy Code (the "Code"), in which a reorganization plan ("Plan") has been confirmed but has not become effective, Global Crossing Limited and its subsidiaries (together, the "Debtors" or "Global Crossing") move, pursuant to sections 363(b) and 1121 of the Code, respectively, for relief of three types.

First and most importantly, they seek an order authorizing them to enter into an Amendment # 2 (the "Amendment") to the purchase agreement (the "Purchase Agreement")[2] which formed the basis for their confirmed plan.[3] The Purchase Agreement, originally with Hutchison Telecommunications Limited ("Hutchison") and Singapore Technologies Telemedia Pte Ltd ("STT"), called for the sale to them of 61.5% of the equity of reorganized Global Crossing ("New GX"), for a price of $250 million, subject to regulatory approvals, which have not yet been obtained; the Purchase Agreement would be continued, if the motion is approved, reinstating a mutuality of obligation that has expired as set forth more fully below.

Second, with Hutchison having dropped out of the transaction, after it appeared that the necessary regulatory approvals would be particularly difficult to obtain if it continued to be a player, the Debtors seek authority to enter into mutual releases with Hutchison.

Third, the Debtors also seek to extend the exclusive period for filing a reorganization plan to the earlier of October 28, or (if the Purchase Agreement is earlier terminated) two weeks from the date of termination.

The Debtors' motion is supported by the Joint Provisional Liquidators (the "JPLs") and its Official Committee of Unsecured Creditors (the "Creditors' Committee"), but is opposed by the agent for the Debtors' bank debt (the "Bank Group"). It is also opposed by XO Communications, Inc. ("XO"), a competing bidder for the Debtors' assets that is also a creditor, having stated that it holds $300 million, face amount, in secured notes (and which now, by reason of recent events, may hold more), and IDT Corporation ("IDT"), another competing bidder for the Debtors' assets that is likewise also a creditor.

As noted at greater length below, a bankruptcy court has neither the role nor the expertise (a) to decide the regulatory issues that have delayed the effectiveness of the Plan or to predict the outcome of the regulatory proceedings, or (b) to substitute its own views as to the optimum business decision for the views of the Debtors' Board of Directors, the JPLs, and their advisors. Similarly, this Court is not called upon to decide on a motion like this one, if it ever would be, whether assets of the Global Crossing estate should be sold to the competing bidders, or under what terms. The issues before the Court are much narrower. The first and second prongs of the Debtors' motion present classic issues under section 363(b): have the Debtors exercised appropriate business judgment in (1) seeking authority to execute Amendment # 2 (as contrasted to

---

1. This written decision memorializes the Court's earlier bench decision, delivered orally in part, of July 1, 2003. (ECF # 3306).

2. ECF # 2586, Exh. A.

3. Debtors Exh. 4.

other options, such as terminating the Purchase Agreement, or continuing the Purchase Agreement without change and without mutuality of obligation, pending the necessary regulatory approvals), and (2) proposing to exchange the mutual releases. The Court finds, as mixed questions of fact and law, with respect to the first two issues, that the Debtors *have* exercised the requisite business judgment, and that the Amendment and releases consequently should be approved.

The third issue calls for straightforward application of section 1121 doctrine. With respect to that, the Court finds, as a mixed question of fact and law, that the Debtors have shown the requisite good cause for an exclusivity extension; that they have given the Court no reason to believe that they are abusing their exclusivity rights; and that, as a consequence, the requested extension of exclusivity also should be granted.

The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with this determination.

*Facts*

1. *Background*

As facts the Court finds that this controversy arises in the context of the now confirmed plan of reorganization for Global Crossing Limited and its subsidiaries, whose plan called for a sale of the majority stake in the reorganized debtors to Hutchison and STT. On August 9, 2002, the Court approved the Purchase Agreement, which was among Global Crossing Limited, Global Crossing Holdings Limited, the JPLs (who were appointed by the Supreme Court of Bermuda in joint provisional liquidation cases commenced by cer-

tain of the Debtors in Bermuda), Hutchison and STT. Hutchison and STT were referred to in the Purchase Agreement, and elsewhere, as the "Investors." The Purchase Agreement was the basis for the ultimately consensual plan of reorganization confirmed by the Debtors under a confirmation order dated December 26, 2002.

A significant aspect of the plan, aside from the investment in New GX that would result from the Purchase Agreement, was the resolution of a number of potentially divisive intercreditor disputes: (1) between holders of unsecured claims ("Unsecured Creditors") on the one hand, and holders of bank debt (the "Bank Creditors"), on the other (who, at least for the most part, had liens on subsidiaries' stock, but not on hard assets); and (2) as between the Unsecured Creditors themselves, who held claims against diverse Debtors in the larger Global Crossing enterprise that were acquired at different times, and in some cases,[4] before Global Crossing had acquired it. The former issues were settled without litigation; some of the latter were litigated, but they were settled in the course of the confirmation hearing. Resolution of those issues was achieved only with considerable effort, and the Court finds, as relevant to matters to be discussed below, that avoiding the need to renegotiate and/or relitigate those issues again was a plainly valid, and very significant, factor that the Debtors could (and did) take into account in determining their course of action in connection with this motion.

As a consequence of those negotiations, the Bank Creditors and the Unsecured Creditors agreed to receive distributions in

---

**4.** For example, claims against Frontier, which after its acquisition by Global Crossing, be-

came Global Crossing North America.

different forms. The Bank Creditors negotiated a recovery heavy in cash and notes, and with a very modest amount of equity in New GX. As described in the Plan's Disclosure Statement, the Bank Creditors' recovery on their claims ("Lender Claims") was estimated to be 22.7%.[5] By contrast, the Unsecured Creditors received much less in the way of cash and notes, and took, instead, a much greater amount of equity; their recovery, once more as described in the Disclosure Statement, was estimated to be (depending on their class) 1.4% to 3.2%.[6]

As a result, the Bank Creditors would secure distributions with considerably lesser upside and considerably lesser downside. The recoveries to Unsecured Creditors would turn much more on the value of the resulting equity. Of course, the recoveries to each constituency would be contingent on the effectiveness of the Plan, and/or the ability to sell one's claim, along with the price at which a claim could be sold.

By reason of the different currencies in which distributions to the two principal constituencies would be made, their respective shares of the total value for creditors of the Global Crossing estate have changed since the Plan was confirmed. At the time of confirmation, the Bank Creditors were said to be receiving 80% of the value; Unsecured Creditors would receive 20%. By reason of market forces since the time of confirmation, and actual or perceived increases in the value of the equity to be distributed, the value of the distributions to Unsecured Creditors—whose recoveries would depend on the equity value to a much greater degree than those of Bank Creditors—increased relative to the recoveries on Bank Creditors' claims.

Based on the investment of $250 million by STT in exchange for 61.5% of New GX's common stock, the enterprise value of New GX at the time of confirmation of the Plan can be computed to have been approximately $407 million.[7] By an alternate means of valuation of enterprises, determining an imputed value based on the trading prices for the underlying claims in the market place, it appears that by June 2003, the value of the equity to be distributed if and when the Plan becomes effective increased substantially. Claims of Unsecured Creditors in this case, which at the time of confirmation were trading at about 1¢, increased to about 5¢.[8] The imputed value of the equity that would be distributed on those claims could be deemed to have increased correspondingly, and the increase in value to the Unsecured Creditors can be roughly regarded to be $81 million,[9] though the Court agrees with the Creditors' Committee, and finds, that this fails to take into account the fact that one could not realistically expect the entirety of the unsecured debt to be disposed of in the marketplace without materially depressing the price—if, indeed, it could be done at all. Likewise, the imputed value of the equity that STT would receive, under the same analysis, can be regarded to be $153 million,[10] though it is possible

---

**5.** Disclosure Statement at 9.

**6.** *Id.*

**7.** There was some testimony, when a witness tried to do the math in his head, that the value would be $412 million. (6/25 Hrg. Tr. at 368). The Court believes a more accurate result to be approximately $407 million, and

so finds, but in any event, does not find any differences in that regard to be material.

**8.** Creditors' Comm. Exh. 1; *accord* Banks Exh. 10.

**9.** Banks Exh. 14.

**10.** *Id.* The Court accepts the mathematical computation, but does not find that the Bank

that the Creditors' Committee's points about the ability to move large blocks of equity into the marketplace would be applicable here as well. The imputed value of the equity that the Bank Creditors would receive has also increased, but since it is such a small part of the Bank Creditors' recoveries, the Court finds that the Bank Creditors' recoveries have not changed materially, and have remained essentially flat. The Court finds that to the extent that the marketplace is an indication, the value of the Plan has increased for Unsecured Creditors, and also for STT. Of course, the ability of each to realize on that increased value is contingent upon the effectiveness of the Plan, which is in turn contingent upon the necessary regulatory approvals, discussed below.

For the foregoing reasons, the Court finds that even though consummating the Plan as confirmed would be highly desirable to STT, it would be highly desirable to the Debtors and the Creditors' Committee as well, and would not be prejudicial to Bank Creditors; the latter would be getting what they bargained for, and a little bit more.

## 2. The Purchase Agreement

As previously noted, on the closing described in the Purchase Agreement, Hutchison and STT would pay the Debtors a combined $250 million for 61.5% of the equity in a newly-formed company, New GX, to which Global Crossing Limited and Global Crossing Holdings Limited would transfer substantially all of their assets. At this point, the Debtors' reorganization plan would become effective.

Obligations under the Purchase Agreement (and thus the effectiveness of the Plan) have been contingent on obtaining regulatory approvals from a wide array of federal, state and foreign agencies and jurisdictions. The bulk of these approvals have been obtained. But significantly, approval has not yet been forthcoming from two federal entities: (1) the Committee on Foreign Investment in the United States, which is often referred to as "CFIUS;" and (2) the Federal Communications Commission, or "FCC." Hutchison is a Hong Kong entity, and Hong Kong is now under the political control of the Peoples' Republic of China, and this plainly made securing approval from CFIUS, which focuses in significant part on national security concerns, difficult or impossible. STT is owned and controlled by the Government of Singapore, with which the U.S. has quite a good relationship, and the national security concerns, if any, with respect to that (and perhaps more to the point, the prophylactic measures that should be put into place to alleviate any national security concerns) have been a matter of ongoing discussion. As the Court will have noted more than once in this discussion—because the point needs to be emphasized—the Court is not in a position to express any views on such issues.

The Purchase Agreement had a number of provisions relevant to the motions now before the Court, including those relating to (1) prohibited solicitation (sometimes referred to as a "no shop"); (2) a so-called "fiduciary out;" and (3) termination; these provisions overlapped in material ways.

First, and highly relevant to this motion, was a "No Solicitation" section, Section 4.3. It provided, in relevant part (reformatting it to make it easier to read, and with emphasis added):

*Except for actions required to be taken to comply with its fiduciary duties under applicable Laws,* based upon consultation with external counsel, the Compa-

Creditors' characterization of that, as a

"windfall," *id.,* is appropriate.

ny shall not . . . nor shall it authorize or permit any Representatives of the Company . . . to:

(a) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any

(i) sale, lease or other disposition directly or indirectly by merger, consolidation . . . or otherwise, of any Assets of the Company . . .;

(ii) issuance or sale of any equity interests in the Company . . .; or

(iii) transaction [in] which any Person will acquire beneficial ownership or the right to acquire beneficial ownership of equity interests in the Company . . . (any of the foregoing, a "Disposition"),

(b) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to any Disposition, or

(c) enter into any agreement with respect to any Disposition. . . .

Purchase Agreement § 4.3 (emphasis added).

Also, and significantly, Section 7.1(*l* ) of the Purchase Agreement provided that the Purchase Agreement could be terminated by Global Crossing "if it is required to do so in order to discharge its fiduciary duties under applicable Law, based upon consultation with external counsel." [11]

The Purchase Agreement had a "Liquidated Damages" provision, which some of the objectors have characterized as a break-up fee, in the Purchase Agreement's section 7.3(a)(i). That provision has a number of the characteristics of a break-up fee, but not all of them, and the Court prefers to simply call it what the parties called it. Section 7.3(a)(i) provided, in substance, that if the Purchase Agreement was terminated pursuant to certain identified provisions—which included, among others, the "fiduciary out" termination provision of Section 7.2—the Investors would be entitled to liquidated damages of $30 million. It further provided (with some simplification, and as relevant here) that if any person or group became the owner of 30% or more of the Bank Group's claims and thereafter the Purchase Agreement was terminated as a direct or indirect result of the action of such person or group, the liquidated damages would be $50 million.

### 3. Events as a Consequence of Regulatory Approval Delays

Section 7.1(b)(A) of the Purchase Agreement provided that the Purchase Agreement could be terminated by Global Crossing, or by either of the Investors, if the closing was not consummated, as a consequence of failure to get necessary regulatory approvals, by April 30, 2003. This provision was not, however, included among the provisions set forth in Section 7.3(a)(1) that would trigger the duty on the part of Global Crossing to pay liquidated damages, and thus, in that circumstance (which now has taken place), each of Global Crossing and STT could (and now can) terminate the Purchase Agreement without penalty.

Because of the regulatory issues associated with the approval of the purchase so long as Hutchison was a player, Hutchison exercised its contractual rights to withdraw as a potential investor on April 30,

---

**11.** Thus, "fiduciary out" exceptions to obligations appear in two separate places of the

Purchase Agreement—Sections 4.3 and 7.1(*l*).

2003, and STT exercised its contractual rights to take Hutchison's place under the Purchase Agreement—in other words, making the entire investment by itself. As a result, the Debtors had to amend certain regulatory filings already made, and to re-file certain other filings, including, most significantly, those with CFIUS and the FCC. The Court finds, based on the testimony of Mr. Eizenstat and Mr. Lambert, and the notes of meetings of the Board and its independent directors, that the Board was briefed, repeatedly and in detail, on the ongoing matters with CFIUS, and was in a position to make an informed judgment with respect to the matter of CFIUS approval. Evidence at the evidentiary hearing on this matter led the Court to conclude that the CFIUS process is moving satisfactorily, but there are nevertheless uncertainties with respect to it. The Court finds, based on the testimony of Mr. Eizenstat, that the CFIUS process would likely take an additional 30 to 90 days from the date of his testimony.[12] The Court further finds, once more based on testimony of Mr. Eizenstat, that there is no assurance that CFIUS approval will be granted, but that there is a sound basis for the Board having proceeded under the assumption that CFIUS approval of a transaction with STT alone will ultimately be granted.

The possibility that the necessary regulatory approvals could be denied or delayed was plainly recognized from the start. The Purchase Agreement provided for a longer time for securing regulatory approvals than it did for addressing other conditions to closing;[13] it was terminable after April 30, 2003, by either the Debtors or STT. Neither party has done so, but as of the date of this decision, either of the remaining parties, the Debtors or STT, could withdraw from the transaction without penalty.[14] The Court notes that the Purchase Agreement did not provide that it would automatically self-destruct after April 30, but rather gave non-withdrawing parties the *option* to withdraw, and, as the Court has noted, neither the Debtors nor STT have yet availed themselves of this option.

### 4. Consideration of Options by the Debtors

Initially at times shortly before and shortly after the April 30 withdrawal of Hutchison from the Purchase Agreement, and continuing thereafter through the hearing on the motion, the Debtors' options with respect to the subject matter of the motion were considered by the Debtors' management, Board, and JPLs. The Debtors' CEO (who is also a director), its financial personnel, and general counsel were actively involved, along with the entirety of the Board;[15] the Debtors' bankruptcy counsel;[16] Bermuda counsel;[17] regulatory counsel;[18] financial advisors;[19]

---

**12.** 6/25 Hrg. Tr. at 226.

**13.** *Compare* Purchase Agreement Section 7.1(b)(A) (failure to obtain required regulatory approvals) *with* Purchase Agreement Section 7.1(b) (failure to satisfy other conditions).

**14.** Debtors Exh. 4; 6/25 Hrg. Tr. 104 (Newman testimony).

**15.** The Board has five members (Lambert, Kane, Legere, Cook and Ullman), of which three are independent and not members of management, including the Co–Chairs of the Board, Lambert and Ullman, and Kane.

**16.** Weil, Gotshal & Manges.

**17.** Appleby, Spurling & Kempe.

**18.** Covington & Burling and Skadden Arps (CFIUS matters) and Swidler Berlin Shereff Friedman (FCC matters).

**19.** Blackstone Group. The Debtors were counseled by Blackstone Senior Managing Director Arthur Newman.

the JPLs[20] and their counsel.[21] To an extent rarely seen in this Court, even in the large cases that this Court regularly sees, these matters were handled at the Board level, rather than at the management level. In the period between April 28, 2003 and June 23, 2003, the Board or its independent directors met, in person or telephonically, nine times.[22]

By April 28, the Board was aware that CFIUS approval of the Investors' purchase of the controlling interest in New GX would be very difficult so long as Hutchison was one of the Investors, and by April 30 was told that Hutchison had indicated that it would withdraw from the Purchase Agreement, and that STT would step into its place.[23]

At its meeting of May 13, the Board discussed a number of issues with respect to the implementation of the Purchase Agreement, particularly with respect to the required regulatory approvals, a Purchase Agreement amendment proposal, and the Bank Creditors' reaction to it.[24] On the next day, May 14, the Debtors filed the Motion.

### 5. Other Expressions of Interest

Starting on or about February 25, 2003, potential additional bidders for Global Crossing or its assets began to surface, although their expressions of interest left many questions unanswered—most significantly, whether the Debtors and their creditors could responsibly look to them as alternatives if the Debtors were to terminate the Purchase Agreement with Hutchison and STT (and later STT alone), or if STT were to terminate after Hutchison did so. On February 25, 2003, before Hutchison terminated and STT stepped into Hutchison's shoes, IDT Corporation issued a press release announcing its intention to submit an offer to purchase Global Crossing, and to submit a bid for that purpose.[25] IDT stated that its bid "will at least match the economics and be more viable than" the Hutchison–STT bid.[26] However, IDT never actually made a formal bid or proposal,[27] although it has continued to express some interest in the Debtors, and objected at the hearing on the motion. The Debtors have referred to what they received from IDT as an "expression of interest,"[28] and this captures well what the Debtors received, on the one hand, and did not receive, on the other.

Thereafter, at a time when Hutchison had already withdrawn from the Purchase Agreement and STT had stepped in, but neither Global Crossing nor STT was bound to the other, the Debtors learned of further interest, from XO, which is controlled by Carl Icahn. On May 30, 2003, XO issued a press release announcing that it had "made an offer" to acquire all of the

---

**20.** Represented by John Milson.

**21.** Shearman & Sterling. The JPLs were represented by James Garrity, a partner of that firm.

**22.** April 28, 2003 (Board, telephonically); April 30, 2003 (Board, in person); May 13, 2003 (Board, telephonically); May 28, 2003 (Board, in person); June 5, 2003 (Board, telephonically); June 19, 2003 (Board, in person, with some participating telephonically); June 21, 2003 (Independent Directors, telephonically); June 22, 2003 (Board, telephonically); June 23, 2003 (Board, principally telephonically, with some participants meeting in person). See Banks Exh. 2.

**23.** Banks Exh. 2 at 000238.

**24.** Id. at 000241–243.

**25.** Banks Exh. 1.

**26.** Id.

**27.** 6/25 Hrg. Tr. at 106 (Newman testimony).

**28.** Debtors Reply at 5 (ECF # 3274).

assets of Global Crossing for consideration said to exceed $700 million, and which XO stated exceeded the STT bid by over $100 million.[29] At about the same time, counsel for the Bank Group and the Creditors Committee, and the Debtors' financial advisor, Arthur Newman, of Blackstone, received an unsigned letter, dated May 30, 2003, with an accompanying term sheet, describing what in one place in the letter was referred to as an "offer" and another place as a "proposal."[30] The communication did not purport to invite an acceptance or to bind XO to anything, nor did it describe conditions to closing, and the Court believes it to be more appropriate to characterize it, as Mr. Newman did, as an "expression of interest." The Court finds that it warranted consideration, but was hardly the kind of offer upon which a debtor responsibly could rely or take action to its detriment, and was hardly a basis upon which the Debtors could responsibly abandon an existing transaction.

The XO expression of interest called for the payment by XO of $250 million of cash, $200 million of new 11% secured notes (secured by all of the assets of Global Crossing), $200 million in junior preferred stock in New Global Crossing (which would be a 100% owned subsidiary of XO), and 15 million 5–year warrants to acquire stock in XO at $10.00 per share. Such a proposal, if implemented, would require a new reorganization plan.

The financial advisors for each of the Debtors and the Creditors' Committee found that from their perspective, notwithstanding XO's assertions, the XO proposal was not superior—particularly from the perspective of Unsecured Creditors, who,

unlike the banks, had elected to take a major portion of their recovery under the confirmed Plan in equity of New GX, which, based on indicia such as the trading prices of the bonds, had increased in value. That view was almost certainly correct, and in any event, not unreasonable. What was significantly lacking in the XO proposal, particularly from the perspective of the Unsecured Creditors, was the upside to be shared in a revived Global Crossing, which was a significant consideration to them at the time of the negotiation of the original Plan.

Thereafter, on or about June 12, 2003, XO announced another expression of interest, this time proposing to pay $700 million in cash in a section 363 sale under which it would be the stalking horse bidder.[31] This expression of interest was likewise considered by the Debtors and their financial advisors, who found it insufficiently attractive for a number of reasons, including the amount and nature of the consideration it offered, the time required to implement a section 363 sale and a subsequent new plan, the probable or certain loss of the intercreditor settlements that had previously been achieved, and the need to take into account administrative expenses in determining its value to creditors. This expression of interest was likewise unacceptable to the Creditors' Committee, on behalf of the Unsecured Creditors, for much the same reasons.

At about the same time, XO announced a tender offer for the Bank Creditors' claims.[32] XO's tender was not subject to

29. Debtors Exh. 9.

30. Debtors Exh. 10.

31. Debtors Exh. 14, 16. In connection with any such section 363 sale, XO would likely want a break-up fee. Icahn Dep. Tr. at 30; Debtors Exh. 23.

32. Debtors Exh. 14.

due diligence or financing,[33] but was predicated upon the termination of the Purchase Agreement;[34] XO would not be obligated to purchase the claims if the Court granted the Debtors' motion.

Then, on June 24, just before the hearing, XO once more tendered for the claims held by the Bank Creditors. Its offer this time was conditioned solely on the agent for the Bank Creditors' not withdrawing the objection to the Debtors' motion that the agent had filed on the Bank Creditors' behalf on June 20; the tender offer was not conditioned on the agent's success in that regard.

Finally, on June 25, 2003, on the morning of the second day of the hearing, XO made a proposal, in what it described as a "firm, non-contingent" offer, for what XO called an " 'insurance' policy."[35] XO issued a press release with respect to its "insurance policy" offer the following day.[36] Under its "insurance policy," XO proposed that it be designated as a "backstop," and that it become the purchaser if the necessary regulatory approvals for STT's acquisition had not been obtained by October. Under the accompanying term sheet, *inter alia,* Bank Creditors would receive 22¢ on the dollar on their claims (for an aggregate of approximately $495 million), and Unsecured Creditors would receive $200 million in full satisfaction of all unsecured claims.

This proposal, which was said to supersede all prior XO "offers" other than XO's June 24 tender offer for the Bank Creditors' claims, was also unacceptable to the Creditors' Committee. The Court finds that the economic terms associated with the "insurance policy" proposal were not materially superior to XO's earlier offers, if they were superior at all, and the "insurance policy" aspect of XO's proposal would be of doubtful value as such—as one could not rule out that, at the least, the very presence of the "insurance policy" would make it more difficult to secure approval of the sale to STT.[37]

---

**33.** *Id.*

**34.** *Id.*

**35.** Debtors Exh. 22.

**36.** Debtors Exh. 25 at "Exhibit 1."

**37.** Indeed, the Court finds that—despite the "insurance policy" characterization used by XO to describe its offer, and testimony by XO's witness, Brian Oliver, that was equivocal, at best, in admitting an intention on XO's part to derail the regulatory approval process—XO has taken active, affirmative, steps seeking to block the requisite regulatory approvals. In a submission dated June 26, 2003 (the second day of the three-hearing on this motion, the date Mr. Oliver testified), XO filed "Comments" with the FCC in which XO stated that it "opposes the above-referenced application" seeking FCC approval of the transfer of control of Global Crossing to STT, noting XO's competing bid for Global Crossing, and enclosing with it XO's press release of the same day, described above, quoting Mr. Oliver. (Debtors Exh. 25). Among other things, XO stated that "[t]he record in this proceeding supports a conclusion that the public interest is not served by the transfer, and XO submits that the record warrants a denial of Global Crossing's Application." *Id.* With its submission, XO sought outright disapproval, if possible, or, alternatively, delays that likely would make the transfer impossible. The Court found the efforts by XO's counsel to explain the submission away as wholly unconvincing. Given this submission, the Court does not find Mr. Oliver's testimony in that regard to be credible.

These circumstances further bolster the finding the Court made early in the hearing on the motion (in connection with excluding XO from the *in camera* consideration of CFIUS matters) that XO would benefit as a bidder from the disapproval by regulatory agencies far more than it would benefit as a creditor by approval, and that while, as a creditor, XO is deemed to be a "party-in-interest" (and hence have standing) on this motion, its interests are materially contrary to all of the Debtors' other creditors, or at least those who are not also bidders.

### 6. Liquidity

Without dispute, the Debtors have been subject to a substantial "cash burn." Their liquidity has decreased substantially since the outset of their chapter 11 cases, as a result of negative cash flow that appears likely, if not certain, to continue between July 1 and the end of the year. Having had a cash level of approximately $608 million at the outset of these cases,[38] the Debtors now have approximately $160 million.[39] It was shown that the Debtors require a cash balance of approximately $50 million to adequately meet the cash management, float and regulatory requirements needs of their operating subsidiaries, and thus that they will "run out of cash" if their cash balance drops below that $50 million level.[40] Based on present cash flow projections, that would be likely to happen sometime in October.[41]

At the Board meeting on May 13, just before the filing of the motion, the Board was informed by the Debtors' CEO and the representative of the JPLs that the Debtors' cash position should be fine with the current deal (i.e., with STT), but that any other deal would put the Debtors on a longer timeline where funding might not be adequate.[42] Cash status, requirements, and/or options were also discussed at the Board's meeting of May 28;[43] June 5;[44] June 19;[45] and June 23.[46] The Court finds that the Debtors have been attentive to their liquidity needs.

In addition to the cash held for general operating purposes, there is a pot of cash of somewhat in excess of $300 million,[47] referred to as "restricted cash," which is at least arguably cash collateral of the Bank Creditors, and which would be turned over to them on the consummation of the Plan. The Debtors and, particularly, the Creditors' Committee claim that the Bank Creditors' contention that this properly should be regarded as cash collateral is not as strong as the Bank Creditors say it is, and that even if it is cash collateral, it can be used if the Bank Creditors are provided with the necessary adequate protection—

---

38. Banks Exh. 4.

39. *Id.*

40. Banks Exh. 3.

41. Banks Exh. 6.

Earlier this year, the Debtors paid an aggregate of $50 million in bonus to their staff. The bulk of the bonuses were paid to employees below the highest levels, though $1 million was paid to the Debtors' CEO John Legere. Plainly the wisdom of paying so much in bonuses, and the wisdom of paying them to management at the highest levels, is now subject to fair debate in light of the Debtors' liquidity needs. However, it might be true, as the Debtors have argued, that the failure to pay the bonuses, or at least some of them, would have led to detrimental consequences of other types. The Court is not now in a position to make a finding as to whether the payment of the bonuses was the right decision or not, or to decide, on this record, whether the payment of the bonuses was a failure of appropriate business judgment. Whether or not the earlier payment of bonuses in that amount, and to those people, was right or not, the Court does not consider the past bonus payments to be material to the decisions the Board had to make with respect to the matters that are the subject of this motion, or to the Court's consideration, under the applicable legal standards, of the issues under this motion.

42. Banks Exh. 2 at 000242.

43. *Id.* at 000244–245.

44. *Id.* at 000250; Debtors Exh. 12 at 000014, 000021, 000022.

45. Banks Exh. 2 at 000255–256; Debtors Exh. 17 at 000039, 000047, 000056.

46. Banks Exh. 2 at 000260.

47. 6/25 Hrg. Tr. at 136 (Newman testimony).

presumably a substitute lien on assets of sufficient worth. The Bank Group, not surprisingly, differs with some or all of these contentions. The Court is not in a position to determine the relative strengths of the arguments of the differing sides in that regard, and at this juncture can say no more than access to that cash is a possible option, but one that is hardly free from doubt.

The Debtors and their financial advisors have also been exploring the availability of DIP financing, with two well-known and respected financial entities, in the range of approximately $75 million to $150 million. That would provide a liquidity cushion sufficient to cover the negative cash flow for another several months, depending on the outcome of business uncertainties and efforts at cost control. No DIP financing commitments have been made as of this time. However, the Court finds that it is reasonable for the Debtors and their advisors to believe that a DIP financing facility will be secured.

### 7. Fiduciary Duties Matters

After the withdrawal of Hutchison, and with the state of affairs after April 30, the Debtors were in a position under which they had to make a decision as to the best way to proceed—essentially choosing from three principal options. They could (1) terminate the Purchase Agreement, severing their relations with STT, and leaving them without STT as a buyer; (2) continue in the status quo, in an arrangement under which STT would continue, but would not be bound to close; or (3) enter into an amendment of the Purchase Agreement under which each of Global Crossing and STT would once more be bound, though Global Crossing would retain the "fiduciary out" discussed above and below. The Debtor's decision to choose the third of

those options has triggered the objections in the motion.

In making its decision, the Board and its advisors took certain steps prior to the filing of the motion, and additional steps in the period thereafter, in the time between the filing of the motion and the start of the hearing. The Board members also communicated with each other, to the extent they could, when XO's "insurance policy" proposal was made in the middle of the ongoing hearing.

Prior to the filing of the motion, the Debtor's Board consulted with its professional advisors, its legal counsel (both bankruptcy and regulatory), and its financial advisors, along with the JPLs and their counsel. It also consulted with each of its Bank Creditors and Unsecured Creditors constituencies. The Board considered its options at length. While the members of the Board (a majority of whom were independent) considered comments by the Debtors' management, which (by reason of potential loss of jobs) was not as objective, it is clear, and the Court finds, that all relevant decisions were made by the Board, and not by management, and that the Board's decision was not inappropriately directed or swayed by managements' views. It is also clear, and the Court finds, that while the Board, appropriately, considered the views of Unsecured Creditors, it did not take the action it did merely because Unsecured Creditors asked it to.

Mr. Lambert, one of the Co–Chairmen of the Board, testified:

> My fiduciary obligation and that of my fellow board members is to seek to maximize the value of the estate, taking into account all of the creditor constituencies in the process.

6/26 Hrg. Tr. at 47. Likewise, the applicable fiduciary duties were expressly discussed in some detail in at least the Board

Meetings of June 5, 2003 [48] and June 19, 2003.[49] The record plainly reflects, and the Court finds, that the Board had a proper understanding of its fiduciary duties, including, without limitation, in connection with its consideration of XO's competing expressions of interest.

The Board took a number of factors into account in determining that it should proceed with Amendment # 2, some before the XO expressions of interest surfaced, and some additional factors thereafter. The Court finds that factors the Board considered in the former category included the following:

- The desirability of locking down the STT commitment, and preserving the estate's ability to hold STT to its earlier deal; [50]

- The cost and risk of a new auction for the company;

- A strong reluctance to throw the earlier reorganization plan (and related Bermuda Scheme of Arrangement) away, particularly as a consequence of the settlement, in the earlier plan, of the intercreditor disputes;

- Avoiding costs and delays associated with the need for the drafting of a new plan, a new disclosure statement, and a new solicitation, and avoiding new potential confirmation disputes;

- Liquidity issues were capable of being addressed, by securing DIP financing, if necessary, and would be no less of a problem, and possibly more of a problem, if the Debtors decided to start over with solicitation of offers, or confirmation of a new plan;

- Entering into Amendment # 2 would not preclude the estate from taking a better deal if one should surface; [51]

- There were risks of regulatory disapproval by CFIUS or the FCC, which were more than *de minimus*, but were not so great as to counterbalance the preceding factors;

- Any transaction with another purchaser would still require FCC approval, and would require other, new, regulatory filings and approvals, even if CFIUS approval did not need to be obtained; and

- The support, by the Creditors' Committee, of this course of action.[52]

**48.** Debtors Exh. 12 at 000014, 000019.

**49.** Debtors Exh. 17 at 000047.

**50.** The Court found the Bank Creditors' witness Mr. Grillo highly credible, and finds that the transaction was, as the Bank Creditors have argued, desirable from STT's perspective as well. Thus it is entirely possible that STT would recognize this and determine that it should not withdraw from the transaction. However, it might also be the case that STT would be reluctant to go all the way through the regulatory approval process only to find that it is later left at the altar—a matter that is still possible, but which would be ameliorated by the Liquidated Damages Provision. Under all the circumstances, the Court finds that it was reasonable, especially given the uncertainties involved, for the Board to conclude that the risks of being unprotected with re-

spect to a prospective purchaser trumped the possibility that STT, if not bound, would not choose to withdraw, and that the risks warranted steps to protect the estate's exposure in that regard.

**51.** The Court so finds notwithstanding the Liquidated Damages Provision. It is not a break-up fee (having been put into place after STT won the auction), but has the effect of a break-up fee in material respects. The Court finds that under the facts of this case, the Liquidated Damages Provision would of course be taken into account by any prospective bidder, but would not chill bidding—*inter alia*, as shown, in the days thereafter, by continuing interest on the part of XO.

**52.** In this latter respect, the Court finds that Creditors' Committee support was a factor, but not the only factor.

After XO's expressions of interest appeared and were repeated, factors the Board considered (particularly at its meetings of June 5 and June 19) included the foregoing, and also included:

- The importance of keeping the bird in hand, as contrasted to another in the bush;
- If XO were the only game in town, it would be difficult to negotiate with, particularly in view of Mr. Icahn's reputation as a formidable negotiator;[53]
- Available value usually increases with competition;
- Even if XO were to propose an acceptable transaction, there would be a passage of some time for XO to also secure FCC approval;
- Entering into Amendment #2 would not preclude doing a deal with XO or another; and
- The continuing dissatisfaction with the XO expressions of interest on the part of the Creditors' Committee.[54]

The Court finds that the factors the Board considered—before making the motion and at later times, after the motion was filed and expressions of interest from XO surfaced—were reasonable for the Board to take into account, and were considered in a reasonable manner.[55]

### 8. Releases

The Debtors also propose to exchange releases with Hutchison. The Debtors'

showing of business judgment and a business purpose in granting the releases is materially less than with respect to Amendment #2—and may not be much more than as an act of decency and upright dealing, in the light of Hutchison's own decency and upright dealing after likely regulatory disapproval made it the wiser course for Hutchison to withdraw. But there are some modest advantages in knowing that no claims could be asserted against the estate, even though there are now no known bases upon which Hutchison could assert claims.

By the same token, as there are no known claims that the estate could assert either, the apparent downside to the estate appears minimal, and the Court is not in a position to find, and does not find, that the exchange of releases is unreasonable. The Court finds that granting the releases is a satisfactory exercise of business judgment.

### 9. Exclusivity

The Debtors further seek an extension of their exclusive periods for filing a plan—not so much because the Debtors intend to file one, but because the Debtors wish to have at least original control of the process if the necessary regulatory approvals fail to be obtained, and they wish to avoid the disruptive effects that might result from giving anyone else the right to file a plan.

---

53. 6/25 Hrg. Tr. at 111 (Newman testimony); *id.* at 362 (Belinsky testimony).

54. Once more the Court finds that while the Creditors' Committee's views were taken into account—properly so, in the Court's view—they were not the only factor, nor did the Creditors' Committee's views unduly trump other factors.

55. The Debtors were criticized at the hearing for their compliance with the "no-shop" provisions of the Purchase Agreement, given that

it had a carve-out for communications required for the Debtors to comply with their fiduciary duties. Based on the quality of the offers presented so far, the Court is not troubled by the Debtors' reluctance to risk a violation of those provisions. Of course, if the offers were to improve to a certain point (particularly if the offers reached a level sufficient to attract the interest of the Unsecured Creditors), there would likely come a time at which the "fiduciary out" provision would appropriately be invoked.

In this connection, the Court finds that the Debtors have not acted inappropriately, in any way, to control the Plan process to the detriment of their creditors, and to the contrary are trying to preserve the confirmed consensual Plan that their creditors agreed to last December. Neither of the Debtors' two principal constituencies—the Bank Creditors and the Unsecured Creditors—has stated that it has a plan it would file if exclusivity were ended, and in fact the Unsecured Creditors support an extension of exclusivity. The principal beneficiary of a denial of an extension of exclusivity would be XO, which would presumably use it to try to secure control of the Debtors. The Debtors' desire for a continuation of exclusivity under these circumstances is, at the least, well taken, and the Court finds cause for the extension.

### Discussion

### I.

■ Section 363(b) of the Bankruptcy Code provides that the "Trustee," [56] after "notice and a hearing"—which means notice and an opportunity to object, and a hearing if there are any objections—"may use, sell, or lease, other than in the ordinary course of business property of the estate." In other words, where, as here, the debtor proposes to enter into a transaction out of the ordinary course with respect to a disposition of its assets and there are objections, the approval of the Court, after a hearing, is required.

#### 1. Standards for Determination

Standards for a motion of this character in this Circuit appear in the Second Circuit's decisions in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir.1983) ("*Lionel*"), and *Official Committee of*

Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141 (2d Cir.1992) ("*Chateaugay*"). A particularly useful synthesis of the applicable law appears in the opinion of Chief Judge Mukasey of the district court, in *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y.1992) ("*Integrated Resources–District*"), aff'g, *In re Integrated Resources, Inc.*, 135 B.R. 746 (Bankr.S.D.N.Y.1992) (Blackshear, J.) ("*Integrated Resources–Bankruptcy*"). Instructive decisions from other districts include *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D.Del.1999) (Farnan, C.J.) (on appeal from bankruptcy court, concluding that debtors established a sound business purpose for proposed retention, severance and retirement programs, relying on *Lionel*, Delaware cases, and law from other jurisdictions); *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D.Mass.2001) (Feeney, C.J.) (noting that a debtor's business decision to commit itself to a KERP "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice' ") (citation omitted); *In re America West Airlines, Inc.*, 171 B.R. 674, 678 (Bankr.D.Ariz.1994) (Mooreman, J.) (determining that bonuses to employees were reasonable and fair under the history of the case, and were a "valid exercise of the Debtor's business judgment"). In a recent decision in this Court, which is reported only on the Court's ECF system, the Court discussed some of the underlying law. *See In re Adelphia Communications Corp.*, No. 02–

---

**56.** For the purposes here, "Trustee" includes a chapter 11 debtor in possession. *See* Bank-ruptcy Code section 1107(a).

41729(REG) (Bankr.S.D.N.Y. Mar. 4, 2003) (ECF # 1475).

In the respects relevant here, *Lionel*, an early case under the Code, holds that a section 363 application requires a showing that there is a "good business reason to grant such an application." 722 F.2d at 1071. While *Lionel* further teaches that the required "good business reason" is not established when the only reason advanced is the "Creditors' Committee's insistence on it," *id.*, that latter concern is inapplicable here, by reason of the Court's finding that the Creditors' Committee's views were only a part of a much broader array of reasons that were considered as part of the Board's decision.

Chief Judge Mukasey's analysis in *Integrated Resources–District*, involving a financial commitment, a break-up fee, is more extensive in its discussion than *Lionel* and more to the point here. Judge Mukasey noted, with approval, the recognition by Judge Blackshear of this Court in *Integrated Resources–Bankruptcy* that "the business judgment of the Debtor is the standard applied under the law in this district." 147 B.R. at 656, quoting *Integrated Resources–Bankruptcy*, 135 B.R. at 752–753. Judge Mukasey continued that the question that remained for him in that case was how the business judgment rule would then apply to the matter before him—bidding incentives, such as break-up fees. 147 B.R. at 656.

Judge Mukasey started by explaining the business judgment rule, citing holdings of the Delaware Supreme Court:

> The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."

147 B.R. at 656, quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Judge Mukasey observed that the Delaware business judgment rule principles have "vitality by analogy" in chapter 11. 147 B.R. at 656.[57]

Judge Mukasey continued that the business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Id.* (citing Dennis J. Block *et al., The Business Judgment Rule* 12 (3d ed.1991)). In that connection, he observed further that courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. *Id.* (citing *Van Gorkom*, 488 A.2d at 872–73); *FSLIC v. Musacchio*, 695 F.Supp. 1053, 1064 (N.D.Cal.1988) ("a ruling on the applicability of the business judgment rule is peculiarly a question of fact"); *Burton v. Exxon Corp.*, 583 F.Supp. 405, 415 (S.D.N.Y.1984). He further observed that courts "will uphold the board's decisions as long as they are attributable 'to any rational business purpose.'" *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y.1988) (citations omitted).

In *Montgomery Ward*, Judge Farnan of the District of Delaware, affirming an order of the bankruptcy court (and, as noted

---

**57.** Judge Mukasey continued: "especially where the Debtor Integrated is a Delaware corporation." *Id.* In this case, the highest level Debtors are organized under the laws of Bermuda. On this motion, no one has disputed that the law of Bermuda is essentially the same, and all parties have relied upon applicable Delaware law.

above, relying on caselaw from a number of jurisdictions, including *Lionel* ), noted that:

In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b), courts consider a variety of factors, which essentially represent a "business judgment test."

242 B.R. at 153 (citing *Collier on Bankruptcy* § 363.02 (15th ed.1997)). In that connection, the Delaware Supreme Court has noted that a court should "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n. 17 (Del.1994) (internal citations and quotations omitted). Similarly, the Delaware Chancery Court has noted that "courts have long been reluctant to second-guess such decisions when they appear to have been made in good faith." *Solash v. Telex Corp.*, 1988 WL 3587, at *7, 1988 Del. Ch. LEXIS 7, at *21 (Del. Ch. Jan 19, 1988).

### 2. Application of those Standards

■ Here no litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled, based on the cases described above, to reject it. Rather, with only one exception,[58] the thrust of the opposing arguments has been that given risks involved, the determination of the Board to choose the course it did was an unreasonable one.

Here the Court has noted the extensive process under which the Debtors made this decision. Faced with uncertainties no matter which option the Board might choose, the Debtors employed a process that maximized their ability to make a sound decision. They were mindful of their duties, employing the right standard;

---

**58.** Counsel for the Bank Creditors, in an able argument, articulated the issue in terms of "maximizing value," which is, of course, a very important, if not critical, goal. But the issue, as the Court sees it, is whether in making the decision it did, the Board acted with the requisite care, disinterestedness and good faith in the effort to maximize value—rather than whether this or any other court would necessarily make the same business decision, on the one hand, or seek to maximize value in a different way, on the other. Cases cited by the Bank Group for the "maximizing value" proposition—*Integrated Resources* and *Paramount Communications*—underscore the importance of maximizing value, but they speak to maximizing value as the *objective*. *See Integrated Resources–District*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the *objective* of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (emphasis added); *Paramount Communications*, 637 A.2d at 44 ("In the sale of control context, the directors must focus on one primary *objective*—to secure the transaction offering the best value reasonably available for the stockholders ...") (emphasis added). In the absence of failures to comply with the key duties—the requisite care, disinterestedness and good faith—those cases do not authorize bankruptcy courts to dictate the *means* to achieve that objective, nor, in particular, do they provide authority for a court, especially a bankruptcy court, to substitute its business judgment as to the appropriate means for that of a board.

Efforts to maximize value not infrequently require choosing one of a number of options, more than one of which may be reasonable. The Court agrees with the Bank Creditors that maximizing value is the appropriate goal and the focus of the exercise of business judgment, but in light of the caselaw described above, the Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the Debtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw.

solicited the input of their professional advisors and the JPLs;[59] deliberated; and made their decision based on a lengthy consideration of the relevant facts and options. Any conflicts of interest that *management* had did not translate into a material effect on the *Board,* which the Court finds, as a mixed question of fact and law, was appropriately disinterested. The Court finds, as a mixed question of fact and law, that the Board made the relevant business decision after considering its options on an informed basis, with due care, in good faith, and in the honest belief that the action it proposed to take was in the best interests of the company.[60]

 *Lionel* teaches that a chapter 11 debtor should not take an action simply because a particular constituency, even an important one, wants it. But it would be a terrible mistake, from the Court's perspective, to jump from that to a view that a debtor should be penalized for considering the needs and concerns of its creditor constituents. That is a factor that plainly should be considered, so long as it is not given undue weight. It is well established that when a corporation gets into the zone of insolvency, the fiduciary duties of its board expand from the corporation's stock-

holders to its creditors,[61] and the Board's consideration of the views of the Unsecured Creditors (along with the views of the Bank Creditors, though their views ultimately were not subscribed to) was consistent with this principle.

The Court also believes, and finds, as a mixed question of fact and law, that the Debtors' response to the overtures of XO was fully consistent with their fiduciary duty, which called for them to consider XO's expressions of interest (which the Court finds that they did), but not, necessarily, to embrace XO as a bidder or abandon their other options—particularly in light of their view, which the Creditors' Committee shared, that XO's offer was insufficient. If this Court were to believe, for half a second, that the Debtors had spurned a better offer to the detriment of their fiduciary duties, this Court would not hesitate to invoke its powers. But there is no basis, on this extensive record, for any such finding. Rather, the record reflects that with the "fiduciary out" provisions in Sections 4.3 and 7.1($l$) of the Purchase Agreement, execution of Amendment # 2 still permits the Debtors to make an appropriate response if a superior offer is

---

**59.** The latter is not insignificant. Nobody has suggested that the JPLs have any interest other than in the performance of their duties, or that they have failed, in any way, to look out for the best interests of creditors. It should be noted, in this connection, that the Court's conclusions with respect to the role of the JPLs are based not on the arguments of their counsel at the hearing, but rather on the Board minutes, Banks Exh. 2, reflecting the input provided by the JPLs' representative and counsel at the Board meetings.

**60.** The Court will assume, *arguendo,* that the final requirement articulated by Judge Mukasey in *Integrated Resources–District,* "no abuse of discretion or waste of corporate assets," must be satisfied as well, but sees no basis for making a finding that either of those disqualifying matters is present here.

**61.** *See, e.g., In re STN Enterprises,* 779 F.2d 901, 904 (2d Cir.1985) ("although in most states directors of a *solvent* corporation do not owe a fiduciary duty to creditors, quite the reverse is true when the corporation becomes insolvent") (emphasis in original); *Clarkson Co. Ltd. v. Shaheen,* 660 F.2d 506, 512 (2d Cir.1981) (under New York law, the director's duty to creditors arose upon insolvency: "[t]he defendants' claim that the duty of directors flows only to the corporation and not to the creditors 'until it is clear that the corporation is no longer a going concern' flies in the face of the New York policy to preserve the assets of insolvent corporations for the creditors").

made that the Debtors should consider by reason of their fiduciary duties.

Assuming that the business judgment test permits and requires this Court, even without making the business decision *ab initio,* to gauge the Board's business judgment on a "reasonableness" standard, the Board's business judgment plainly passes that test as well. The Board's business decision that CFIUS approval would likely be obtained, and at a time when the Debtors would still have the necessary liquidity, was at least reasonable. So was the Board's reasoning that its liquidity concerns would not be helped, and possibly could be aggravated, by starting over with a different approach—especially if starting over would mean the need to revive previously-settled intercreditor disputes. So was the Board's decision that if it abandoned the deal it had, in the hope of getting a better one that was uncertain, the Debtors might be stuck with no deal at all (or one on worse terms), and thus that they should lock in the one good deal they had.

It is indeed true, as the Bank Creditors argued, that there is risk and uncertainty in the decision the Board made, but there is likewise risk and uncertainty in the alternatives. The Board could indeed reasonably regard keeping the STT deal as keeping the "bird in the hand;" abandoning the STT deal could indeed reasonably be viewed, as the Creditors' Committee counsel argued, as "letting the bird in hand go and going out and looking for a bush with some birds in it." [62] Declining to take the associated risks of that was well within the bounds of reasonable business judgment.

In some final observations, the Court wants to clarify that it is not in any way holding that XO is unwelcome as a stakeholder in this case, or as a prospective bidder for the Debtors' assets; this ruling is simply that the Debtors exercised perfectly reasonable business judgment, fully in compliance with the requirements of applicable law, in locking in their deal with STT—even though continuing with STT is not without risk—and in choosing not to abandon the attractive deal they had for one that might or might not be more attractive, if it could be secured at all.

## II.

[blacked out] As previously noted in the factual discussion, the case for exchanging releases with Hutchison is not as strong as the case for proceeding with STT as described above. As a practical matter, it boils down to "doing the right thing," and acting with decency, in the context of no material downside risk. The Court does not believe, under the facts of this case, that the Debtors needed to engage in an extensive investigation in order to act in that fashion; under the facts of this case,[63] if there were material claims that the Debtors might have been able to assert that were within the scope of the prospective releases, the Court is confident that the Debtors and/or their advisors would have been aware of them.

With respect to the issue of exchanging releases, as clarified in oral argument, the Court feels that the parties are "giving away ice in winter." The Court finds no lack of the necessary disinterestedness, due care, or good faith; finds sufficient reason for the view that the decision to

---

**62.** 6/27 Hrg. Tr. at 115 (closing argument of Joseph Ryan, Esq.).

**63.** The Court's conclusion, as the qualifiers hopefully make clear, is based on the facts of this case. The Court does not express a view on the need for investigation before granting releases in other circumstances.

exchange releases was reasonable; and finds no material prejudice to the estate. The Court likewise finds that the decision to exchange the releases was reasonable. This aspect of the motion is also granted.

### III.

■ The Court's decision as to exclusivity starts with the facts and analysis with respect to the execution of Amendment # 2, and the facts as to exclusivity that the Court found above. The Court believes, and has found, that the Debtors have acted entirely appropriately. The Debtors want to preserve exclusivity not to take advantage of their creditors, but to preserve the benefits of a consensual Plan that their creditors endorsed. That is very good cause indeed.

As importantly, the Court believes that terminating exclusivity would have the potential for serious prejudice to creditors. There is at least a risk, if not certainty, that terminating exclusivity now—particularly when it would not be for the purpose of permitting a creditor constituency to file a competing plan, but rather to facilitate a competing bid—would send the wrong message, and could damage the regulatory approval process that is so important to all creditors, or, at least, all creditors other than those who are bidders.

The exclusivity extension issue here is far over on the "easy" end of the spectrum of circumstances warranting an extension of exclusivity, and it will be granted.

### Conclusion

For the foregoing reasons, all three prongs of the Debtors' motion are granted.